## ESTATE OF ELLA E. SHARPLESS.

APPEAL BY PHEBE A. SHARPLESS FROM THE ORPHANS' COURT
OF CHESTER COUNTY.

Argued February 11, 1890—Decided April 21, 1890.

Under the statute, § 41, act of March 15, 1832, P. L. 146, where there is
a substantial dispute upon a material question of fact, an issue devisa-
vit vel non for the trial of the validity of an alleged will is a matter of
right, and the test of substantiality in the dispute is that a verdict could
be supported by the trial judge, upon a review of all the evidence ad-
duced.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, McCOL-
LUM and MITCHELL, JJ.

No. 90 July Term 1889, Sup. Ct. ; court below, number and
term not given.

On September 13, 1888, Phebe A. Sharpless, entered an
appeal from the decision of the register of wills admitting to

probate a testamentary paper as the will of Ella E. Sharpless, deceased, and on October 29, 1888, presented her petition to the Orphans' Court praying for an issue devisavit vel non.

A citation having been awarded and served, and an answer filed, testimony was heard before the court, BUTLER, J., who on April 27, 1889, filed the following opinion:

"In case of my death, I order all of my estate to be distributed as follows: To my uncle, Walker Rogers, and my aunts, Caroline Thomson, Harriet Andrews and Phebe Singles, I give three hundred dollars each.

The remainder of my estate I order to be equally divided between my uncle Joseph, Aunt Eliza, Harvey, Joseph, Jr., Roger and Lelia May Fronefield; and I order my cousin, W. Roger Fronefield, to settle up my estate.

"April 8, 1887.              ELLA E. SHARPLESS."

This paper is alleged to be the last will and testament of Ella E. Sharpless, and was probated by the register of wills of Chester county on September 3, 1888. From the decision of the register, Phebe A. Sharpless, a half-sister of Ella E. Sharpless, appealed, and now asks the court to direct a precept for an issue to the Common Pleas to try a dispute said to have arisen touching the validity of this writing.

Ella E. Sharpless died on April 19, 1887, from the effects of a hurt received on the 13th of the same month. When she was about six years old her father died, and soon after her mother went with Ella, her only child, to the home of Joseph M. Fronefield to live. The death of Ella's mother occurred about two years after this, while they were still at Mr. Fronefield's house. Before the mother died she requested Mrs. Fronefield, who was her full sister, to take Ella, raise her and care for her as though she were her own child. Ella continued to live in the Fronefield family until her death, with the exception of the time she spent at the Normal school in West Chester. From her parents she inherited quite a large estate. By the will of her mother, Joseph M. Fronefield became her testamentary guardian, and, her father dying intestate, the Orphans' Court of Chester County appointed him the guardian of her person and such estate as she should receive from him. It seems that her life in the Fronefield family was

Opinion of Court below.

almost without incident, and was spent as those of children usually are. She was in all respects treated as one of them; the heads looking upon her as a daughter, and the children as a sister. She seems to have been satisfied with her usage as a member of the family, as well as the care and attention given her by her guardian, with, perhaps, a few exceptions, when she complained to her school-mates that he did not give her enough money to buy the necessaries which she thought her estate entitled her to have. Her father, by his first wife, had three children, one of whom resided in West Chester, within six or seven miles of the home of the Fronefields. Between Miss Sharpless and her kin of the half blood there seems to have been no intimacy. It was said by some of the witnesses, on the hearing, that she complained at times that her half-sister, Phebe A. Sharpless, was wanting in the conduct usually exhibited by so near a relative, and "she did not think she would know her if she would meet her in the street." Six weeks she lay sick with a fever, but they did not visit her, and her funeral took place without their presence.

The cause for this estrangement was not shown on the hearing, but the fact of its existence was developed by the proponents of this alleged will, as a circumstance to support their theory that Miss Sharpless was anxious that those who had neglected her while living should not profit by her death. Of her character, disposition and attainments, but little was shown in the testimony. She seems to have spent her time as girls usually do similarly situated. She was sent to the State Normal School at West Chester for several years, and appeared to have made a number of friends amongst the girls there. To some of them she seems to have confided her intentions as to the disposition she proposed to make of her property.

She reached the age of twenty-one years on December 27, 1886, at which time the money bequeathed her by her mother became her own, without limitation or restriction, as, under the mother's will, it was given over to collaterals in case Ella should die in her minority without leaving issue to survive her.

The name to this paper is admitted by the contestant to be the signature of Ella E. Sharpless. Over this fact, all controversy is therefore at an end. But the contestant says, that some one found the paper upon which Ella E. Sharpless had

Opinion of Court below.

written her name, and, above this name, forged what the proponents insist is the girl's will. The contestant further says that the facts and circumstances, as well as the mystery surrounding the making, finding and producing of this paper, considered along with the condition of Miss Sharpless's estate at the time of her decease, in the hands of her guardian, point with certain conclusion to her guardian, Joseph M. Fronefield as the forger; perhaps, not with his own hand, but by some one at his especial instance.

The contestant in aid of this proposition called a number of witnesses. Eight of them were young ladies about the age of Miss Sharpless; seven of whom were at the Normal School with her. They were all well acquainted with her, and speak of her habit of writing her name on any piece of paper she could find. It seems to have been an uncontrollable desire of this young lady to write her name on anything, whether it was a fly leaf in a book, a blank piece of paper or a tablet; in fact, on any space large enough to hold it. It mattered not the character or value of the thing to be scribbled on; neither was she particular as to the ownership. Sometimes her name was accompanied with her address, but usually appeared without it. Her practice in this respect is pointed to by the contestant, to show how readily a blank piece of paper, with her name upon it, might be found after her death, to tempt and enable someone whose needs demand it to forge a will above the name.

The contestant goes one step further, and calls a witness to show that Ella E. Sharpless, two days before her fatal injury and three days after the date of this instrument, had declared she had not made a will. This witness was Mary D. Garrett, a lady in middle life, a near neighbor of the Fronefields, on terms of intimacy with Miss Sharpless, and she impressed the court with her sincerity and a desire to be strictly accurate. Miss Sharpless was hurt on the fourth day of the week, and this conversation with Mrs Garrett is said to have occurred on the second. She says Miss Sharpless called at her house about three o'clock in the afternoon, and talked with her more than an hour. She said she had been driving somewhere (Mrs. Garrett could not remember where), and intended taking her little sister (by adoption), Lelia Fronefield, home from school with her. About four, she left and went in the direction of

the schoolhouse, as Mrs. Garrett supposed, to get the little girl.

This recital of facts it is necessary and important to remember, because the proponents introduce testimony later on tending to show that this conversation could not have occurred on that day, even if it ever did occur.

Mrs. Garrett says she told her that her guardian proposed giving her some of her estate that spring, and that she intended helping her cousin, Harvey Fronefield, build and furnish his house, and he was then contemplating marriage; "that the folks up there (meaning the Fronefields) wanted her badly to make a will," but says she, "I told them I guess I did not need to do it; I am not going to die yet a while," or something to that purpose.

Then, as to the inducement to the forgery of this paper, the contestant directs the court to the state in which the guardian had this property at the time of Miss Sharpless's death. Within one month of the time she was of age, or in January, 1887, he filed an account of his management of the estate coming to her from her father. This account was confirmed by the Orphans' Court, January 31, 1887. On July 11, 1887, after his ward's death, he filed an account as testamentary guardian, under the will of the ward's mother, and charged himself with the sum of $14,021.92. In this account he claimed, amongst others, credits for moneys paid his wife for clothing purchased his ward, the sum of $500; cash paid his ward, $2,603.75; cash paid his wife for care and nursing the ward, $2,000, and compensation to himself, $1,500. Exceptions were taken to these items, and sustained in part by an auditor in a report made to the Orphans' Court. To this report exceptions were taken by the guardian, and, during their pendency, this alleged will was found. Upon an examination of the guardian, it was discovered that he had property sufficient to pay his indebtedness to his ward's estate, as ascertained by the auditor, although but little of it was invested by him as guardian. This is the contestant's side of the case.

The defence to this is, that Ella E. Sharpless procured some one for her, to write this paper; that she then signed it on the day it bears date, placed it in an old atlas where it was found, and that it is her last will and testament, and must stand until

evidence is produced which will warrant a judicial tribunal, in a careful review of the whole case, to allow a jury to set it aside upon the ground that it is a forgery, and further, that Miss Sharpless repeatedly declared she intended making just such disposition of her property by will as this paper makes; that by reason of her feelings of antipathy to her kin of the half-blood, and her relations to the Fronefield family, this disposal of her estate is the natural result of her manifest intentions; that the discovery of this paper was a mere accident and without any pre-arrangement, as suggested by the contestant.

The proponents produced, as they claimed, the person to whom Miss Sharpless would have been most likely to have made known any inclinations which she might have had concerning the people whom she desired to reward after her decease. This witness was Annie J. Vernon, who resides in Delaware county. They were schoolmates and continued their acquaintance after they parted at school. Miss Sharpless paid her frequent visits, and staid sometimes as long as a month. The last visit was made in February, 1887, on which occasion Miss Sharpless expressed her fondness for her Fronefield relatives, and that she intended to make a will. She spoke of a protracted illness which she had had just about the time she reached her majority, and·was glad she had lived to be able to make a will and leave her property to whom she pleased. In this conversation, she expressed her dislike for her half-sister, the present contestant, and said she was glad she had lived to deprive her of the property she otherwise would have gotten, had she, Miss Sharpless, died in her minority. Miss Vernon testified that similar conversations had been had between them before, but the details of them were not given, with the exception of one about Christmas, 1887, when she expressed herself as "glad she had lived to cheat her (meaning her half-sister) out of what belonged to her." She had informed Miss Vernon that she was aware of the disposition the law would make of her estate should she die without a will, and she was very particular about making one to prevent her half-sister from sharing therein. Another witness, Sarah J. Smeadley, called to see Miss Sharpless sometime in January or February, of 1887. In a conversation had

on this occasion, Miss Sharpless, referring to her late illness, remarked that she did not know how long she would be here, and that she had not yet made her will. She said she knew it was important, and that she meant to do it soon. Twice in the month of March, 1887, George Weidner testified, Miss Sharpless told him she intended making a will, and that she would go to Philadelphia and get a young lady whom she knew there, to write it. He says he asked her to whom she meant to will her property, and she replied, to the Fronefield and Roger families. This witness was a hired man in the employ of Dr. Fronefield, (who resided with his father,) and claimed to have known Miss Sharpless very well during his two years' service at the place. These three witnesses were corroborated upon the principal points in their testimony, by Eliza A. Fronefield and Dr. J. R. Fronefield, respectively the wife and son of the guardian, and named in this paper as legatees.

The proponents endeavor to meet the testimony of Mrs. Garrett, as to Miss Sharpless's declaration that she had not made a will, by showing that the decedent did not see Mrs. Garrett at her house the Monday afternoon before the accident, and therefore the conversation could not have taken place. This particular day was the 11th of April, and Miss Sharpless's whereabouts, in the afternoon of that day, are fixed by the fact that a public sale was held by Mr. Fronefield at his house that afternoon, and Miss Sharpless was not away. That the sale was that afternoon there can be no doubt. Several witnesses speak with great distinctness of her being at home assisting in work to be done in the house; and Lelia Fronefield says she can remember that Ella did not come to school for her that afternoon, and that she walked home. It is true, Dr. Fronefield says his sister was not at school this day, and in this there is a contradiction of Mrs. Garrett, as well as of his sister. Mr. Fronefield was called to show the circumstances under which this will was found. How, in looking for a strap to fix some harness, they accidentally pulled from the top of his book case, an old atlas, out of which this paper rolled with a lot of letters and other papers, the property of Miss Sharpless.

This is about all the testimony offered on one side or the other, and from a review of it, the action of the court must be

determined. Does it present "such a dispute as should be submitted to and passed upon by a jury?" In Knauss's App., 114 Pa. 20, Justice STERRETT says: "In rightly determining that question, there is only one safe and reliable test. If the testimony is such that after a fair and impartial trial resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony, would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute, within the meaning of this act, has arisen." The rule to be observed by the lower court in making the proper disposition of an application of this kind, has been several times defined by the Supreme Court.

The last case passing upon the question, seems to be the one above cited, in which it is plainly held that a dispute, as contemplated by the act, does not exist, if the evidence of the fact as set up here by the contestant is so full of doubt that a verdict in her favor should be set aside on that account. The fact alleged here is, that this paper is a forgery. What proof of it is offered us? The mere fact that the contestant charges a forgery, and the proponents deny it, does not raise a dispute for any tribunal to pass upon. It is the proof of the fact, on one side, and the denial of it on the other, by competent evidence, which raises such a substantial and material dispute as the court must alone consider in determining the application asked for. The signature to this paper was proven by two competent witnesses, to be genuine. This is all the act of assembly, concerning the probate of wills, requires, to admit them of record. The presumption then, is, that it is what it purports to be, although the body of it may not be in the handwriting of the decedent. Miss Sharpless was given to scribbling her name, and probably left behind her many pieces of paper with her name on them. Evidence of this fact does not raise a substantial dispute, for it is not denied by the proponents. Neither do the further facts of the alleged necessities of Joseph M. Fronefield, and the inducements for him to make this paper, the finding of it, in the manner and the time so seasonable to himself, and the character of it as to size and appearance, raise such a substantial dispute as would entitle its submission to a jury.

The contestant says all the facts surrounding this transaction are mysterious and full of suspicion. The proponents say, suppose they are, there is nothing to submit to a jury until substantial and material proof is adduced, tending to show that the paper is not the act and deed of Miss Sharpless. In the judgment of the court, the testimony of Mrs. Garrett, unanswered and taken along with the other circumstances already alluded to, would entitle the contestant to the issue she asks. But the proponents insist that the probabilities of this paper being an honest one are with them, and that Mrs. Garrett is mistaken. On the first part of their proposition they point to decedent's declarations, that this arrangement of her affairs should be effected by her as it is here found; that it is natural that it should be done in this way; that Mr. Fronefield has enough property to enable him to pay the money he owes this estate, and that by the will he profits but little better than he did by the intestate law.

Be these suggestions as they may, if the answer of the proponents leaves the testimony of Mrs. Garrett in doubt, the whole of the contestant's side will be unsatisfactory to the court, and a verdict for her would not be sustained. To disprove her, the proponents call several witnesses who say Miss Sharpless was not away from her home the afternoon Mrs. Garrett says she was at her house and conversed with her. Moreover, they produce one witness, Mrs. Fronefield, who testified that Mrs. Garrett told her a month after Miss Sharpless died, that she, Miss Sharpless, had never spoken to her on the subject of the making of a will. This was denied by Mrs. Garrett. This declaration of decedent was unlike all others she ever made, as testified here, on the subject of how and to whom she intended disposing of her estate. If Miss Sharpless told Mrs. Garrett, in substance, that she had not made a will, could it have been at a time anterior to the date of the paper, and yet Mrs. Garrett believe that it was after its date as she testifies? This paper being proved as required by the act, it is presumed to have been made by Miss Sharpless, and the burden of showing otherwise is upon the contestant. While the evidence offered by her, and the circumstances surrounding the production of the paper, may be sufficient to excite some suspicion of its honesty, and present a case somewhat remarkable in its character,

Opinion of the Court.

yet in a review of all offered on both sides, the court cannot feel satisfied that a verdict in her favor should stand. If a jury on this testimony would find a verdict against the proponents of this alleged will, no court justly exercising its sound discretion could sustain it. It is full of doubt, full of uncertainty, unsatisfactory to the court, and should be to a jury.

Therefore, relying on the rule given us, we must find that no dispute has arisen herein, within the meaning of the act. The appeal is therefore dismissed, and the issue asked for is denied.

—The petitioner then took this appeal, specifying that the court erred in dismissing her appeal and denying the issue devisavit vel non prayed for.

*Mr. Wayne MacVeagh* (with him *Mr. William M. Hayes*), for the appellant.

Counsel cited: § 41, act of March 15, 1832, P. L. 146; Harrison's App., 100 Pa. 458; Schwilke's App., 100 Pa. 628; Knauss's App., 114 Pa. 10; Herster v. Herster, 116 Pa. 612, 626.

*Mr. R. Jones Monaghan* and *Alfred P. Reid* (with them *Mr. Robert S. Waddell, Mr. J. F. E. Hause* and *Mr. H. T. Fairlamb*), for the appellees.

Counsel cited: De Haven's App., 75 Pa. 340; Wainwright's App., 89 Pa. 226; Knauss's App., 114 Pa. 20; Harrison's App., 100 Pa. 460; Schwilke's App., 100 Pa. 631; Wilson v. Mitchell, 101 Pa. 505; Eddey's App., 109 Pa. 419; Herster v. Herster, 122 Pa. 264; Weigel v. Weigel, 5 W. 486; Harding v. Harding, 18 Pa. 340; 1 Williams on Executors, 350; Harrison v. Rowan, 3 Wash. C. C. 580; Vernon v. Kirk, 30 Pa. 218; Hoshauer v. Hoshauer, 26 Pa. 406; Linton's App., 104 Pa. 238; Provis v. Reed, 5 Bing. 435; Jackson v. Kniffen, 2 Johns. 31.

OPINION, MR. JUSTICE MITCHELL:

This case presents but a single point, whether there is sufficient evidence against the proffered will to entitle the contestant to an issue as to its validity. There is no doubt that an issue is matter of right, under the statute, where there is a sub-

Opinion of the Court.

stantial dispute upon a material question of fact, and that the
test of substantiality in the dispute is that a verdict could be
supported by the trial judge upon a review of all the evidence:
De Haven's App., 75 Pa. 340; Harrison's App., 100 Pa. 460;
Schwilke's App., 100 Pa. 631; Knauss's App., 114 Pa. 20.

The contestant presents evidence, in the first place, of the
death of the decedent leaving no known will, the accounting
in her estate by her guardian, running over a period of more
than a year and resulting in a surcharge very large, not only
in proportion to the decedent's estate, but to his own ability
to pay. Under circumstances thus presenting, as contestant
claims, a powerful motive for desperate measures, the proffered
will is produced as discovered by accident in an out of the
way and inappropriate place, loose among waste scraps of pa-
per in an old atlas on top of a book-case. Passing, then, to
the will itself, contestant claims that it is written upon a scrap
of paper insignificant in size and inappropriate to such a pur-
pose; that it lacks all the formalities of execution by a profes-
sional hand, and yet is expressed in a concise and business-like
style, using quasi technical words, "order," "distribute," etc.,
such as indicate a writer of more experience and knowledge of
affairs than the decedent herself possessed, to say nothing of
the absence of any gifts, or even mention of personal trinkets
or tokens to her girl friends, such as might naturally be looked
for in the will of a young girl, fresh from school, coming into
possession of what was regarded as a fortune. Attention is
then called to the strange absence of all clue to the handwrit-
ing of the paper and the circumstances of its execution, and
the unnatural failure of the decedent to mention to any one,
either her young companions, or her relatives who are benefi-
ciaries under the will, the fact of her having made it, reinforced
by affirmative evidence that after the date of the paper pro-
duced, the decedent positively declared that she had not made
a will.

From the evidence, of which this is an outline, contestant
claims that the will was not in existence at the death of the
alleged testatrix, but that it was written after her death, over
her signature carelessly scribbled on a mere scrap of paper, and
is, therefore, a forgery.

To meet this view of the case, the proponents start with the

persuasive fact of an admittedly genuine signature to the will. They show the circumstances of the finding of the will by Caley during a visit at the Fronefield house, upon his own errand, and not by appointment. Looking into the provisions of the will itself, they show that it does what Ella Sharpless would naturally do with her estate, leave it to the relatives with whom she had lived from childhood, and who had been kind to her when a helpless orphan, rather than to the contestant, who, though nearer in blood, had held herself aloof during all the years when the child, at least, was innocent of offence, whatever the cause of the family estrangement may have been, and who had treated her with cruel neglect during a dangerous illness after coming to womanhood. Lastly, the proponents gave testimony that Ella herself had frequently declared to her friends her satisfaction at coming of age, so that she might prevent her property from going to the contestant, and her purpose at once to do what the evidence shows was not only natural and proper, but, as might be said, a moral obligation for her to do, to-wit, make a will leaving her property to the relatives of whose family she formed a part.

In this review, I have touched the evidence lightly, and only the salient points. It is obviously undesirable, at this stage of the case, to indicate, or even to form an opinion as to which side has the weight of the evidence; and I have not done either. Nor have we considered at all the admissibility of any of the evidence referred to, if objected to. Such questions are left free to be determined when they arise.

But, looking at the contestant's evidence separately, it seems to make a case for a jury; and, if no counter evidence were adduced, there would probably be no hesitation as to a verdict. So, on the other hand, it is equally clear that the proponent's evidence would not only support, but, uncontradicted, would command a verdict. Does it, however, so completely meet, answer, and overthrow the contestant's case as to leave but a one-sided issue? We cannot say so. Looking at the whole evidence as put before us in print, we do not think we can safely say that the balance is not doubtful. So much depends on the means of knowledge, the interest or bias, the manner, the character, and the personal weight which each witness carries as an individual among his neighbors and in

the community, that a jury is the only appropriate tribunal, in such a case, to determine which way the balance inclines. Having the testimony present to their eyes as well as their ears, the truth may be made manifest beyond any substantial doubt; and the judge, who will have the same advantage, will still have the final result within his control. To decide it now, as presented, would be to decide it in the dusk, if not in the dark, when full daylight is at hand. For these reasons, we are of opinion that an issue should be awarded.

Decree reversed, and record remitted, with directions to award an issue as prayed.