## Heidenreich's Estate.

*Wills—Probate—Testamentary capacity—Substantial dispute—Issue devisavit vel non—Evidence.*

1. An issue *devisavit vel non* will be awarded where, if the contestant's testimony were submitted to the jury by itself, a verdict for contestant would be sustained, and if the proponent's testimony were also submitted by itself, a verdict for proponent would be sustained.

2. In such case a substantial dispute exists, and an issue should be awarded.

Appeal from Register of Wills. O. C. Schuylkill Co.

*John F. Whalen* and *R. P. Swank*, for contestants.

*M. J. Ryan* and *M. M. Burke*, for proponents.

WILHELM, P. J., Sept. 11, 1922.—William H. Heidenreich died on Dec. 13, 1920, in his eighty-second year, leaving a will, executed on Nov. 21, 1917. The testator was survived by children and grandchildren, and George E. Heidenreich, one of his sons, was the original contestant, and he was subsequently joined by two of the other children. On Dec. 16, 1920, George E. Heidenreich filed a *caveat*, protesting against the probate of any last will and testament of William H. Heidenreich, deceased.

Subsequently the will of William H. Heidenreich was offered for probate, and after petition filed, the Register of Wills was directed by this court to certify the entire record pertaining to the probate of said will to the Orphans' Court, so that said court may determine whether said will or testamentary paper shall be admitted to probate. The ground of this contest is testamentary incapacity and undue influence.

The execution of the will was proved by the witnesses to it; the testamentary capacity of the testator was attempted to be established by the testimony of a number of witnesses and documentary evidence in the handwriting of the testator. After which the proponents of the will produced a number of witnesses tending to establish testamentary capacity.

The witnesses who were present at the signing and execution of the will were of the opinion that the testator was sound mentally when the will was signed; the attorney who drew the will was of the same opinion, and his opinion was based upon his acquaintance with the testator, as well as the fact that a rough draft of the will had been prepared, taken by testator from the office of counsel, subsequently returned and certain alterations directed, as well as the manner and conduct of the testator in other visits to his office upon other matters of a legal nature. Another witness, who attended to repairs of the property of the testator in Mahanoy City, and lived as a near neighbor in one of his houses, saw him frequently and conversed about the repairs in progress and in contemplation, as well as other matters, was of the opinion that the testator was mentally sound.

Other witnesses, who resided at Shamokin, a town more than thirty miles distant from Mahanoy City, the residence of the testator, who did business with him concerning his real estate in Shamokin, which consisted of two houses that were rented to tenants, one of whom was his real estate agent for several years down to 1916, collecting the rents for the houses and paying them to the testator from time to time when testator called to receive the rents collected, and who continued to receive calls from the testator at his office down to the year 1920, when the property was sold, the deed executed by the testator in the office of this witness, was of the opinion that the testator had mental capacity to make a will.

Another agent, who began the collection of the rents for these properties at Shamokin in 1916, who was visited by the testator to receive his rents, and who discussed with the testator certain repairs, was of the opinion that the testator was mentally competent to make a will. The purchaser of the property at Shamokin believed that the testator was mentally sound, and he received his deed and paid the purchase money.

This testimony, considered separately, strongly tends to establish mental capacity, notwithstanding the great age of the testator, and would support a verdict in favor of the will.

On the other hand, the contestants have offered testimony to show that in April, 1917, immediately after the death of testator's brother-in-law, Mr. Haber, who resided at Tamaqua, the testator showed signs of mental decay, and that upon the death of testator's wife on June 21, 1917, while she was lying a corpse in the house, he talked of again marrying; that soon after her burial he told of hearing his wife's voice from the grave commanding him to marry her sister, Mrs. Haber; he visited the Rev. A. C. Schmitthenner and discussed with him his marriage with his sister-in-law; he wrote letters to this reverend gentleman, translations of which are in the record, and his letters and visits caused the Rev. Schmitthenner to be of the opinion that the testator did not have capacity to make a will. The testator also, about

2 D. & C.

this time, wrote letters to Mrs. Haber, a woman of about seventy-five years of age, making proposals of marriage, a copy of the translation of the letters being in the record. The testator visited his daughter in Philadelphia after the death of his wife, had conversations with the pastor of the church with which his daughter was connected, and the conversations were so disconnected and senseless that this witness was of the opinion that the testator did not have mental capacity to make a will. A nephew, the cashier of a bank at Hazelton, who frequently received visits from the testator, and who was told by the testator that he had heard his wife's voice from the grave counseling him to marry Mrs. Haber, testified to the mental incapacity of the testator. Henry Heidenreich, the Mayor of Hazelton, and a nephew of the testator, who was frequently visited by him, said the testator was obsessed with the idea he had discovered the mysteries of the Bible, and was told by the testator that it was necessary to marry his sister-in-law, and if they did not marry "they would be condemned for all eternity," was of the opinion the testator was not mentally capable of making a will.

Dr. J. R. Bissel, a physician who attended the testator from time to·time, testified that, upon observing him in the summer of 1917, he discovered evidence of senility. The letters written by the testator in his own hand, and dictated by him, indicate mental derangement, and it is unnecessary to make an extended reference to these letters, because they are disjointed in expression and senseless in meaning to the ordinary mind. One of the letters, however, is quite important. It is dated Nov. 18, 1917, and was sent to Mrs. Haber, his sister-in-law, whom he desired to marry. This letter was written three days before the execution of the will, in which the testator says "all my friends declare me crazy, even the minister whom I sought to bring about peace between you and me . . . who has declared me as Devil and Satan." This letter indicates that, about the time of the making of the will, the friends of the testator expressed themselves as being of the opinion that he was of unsound mind or he was suffering from a delusion which indicates mental derangement, which may show that he was mentally incapacitated.

If the contestants' testimony, as above recited, would cause a jury to find against the will, would the trial judge feel constrained to set aside the verdict? In other words, if the facts on this record concerning the good mental capacity of the testator were recited to one man or twelve and an opinion solicited, that opinion would undoubtedly be the testator was sound mentally. But if, on the other hand, the contestants' facts alone were given to the same person or persons, the conclusion arrived at would be that he was mentally deranged. Therefore, it can safely be said that a substantial dispute exists, and the rule laid down in Sharpless's Estate, 134 Pa. 250, and cited with approval in Tetlow's Estate, 269 Pa. 486: "When, however, the contestant's evidence 'looked at separately' would support a verdict against the will, and the proponent's evidence, viewed in the same way, would command a contrary verdict, the issues involved should be submitted to the jury." And this rule governs the case now before us, and an issue should be granted to the Court of Common Pleas.

Let an order be prepared directing an issue to the Court of Common Pleas to try the questions involved.