## Keil's Estate.

*Will—Probate—Devisavit vel non—Issue.*

On an appeal from a register of wills admitting a will to probate, the evidence showed that the will was written on one side of a sheet of legal cap, and on the first and third pages of a full sheet, all bound together by wire staples. The first page was closely written while the writing upon the other two pages was in a fuller and freer hand. The scrivener who wrote the will testified that he had endeavored to write it all on a half sheet of paper, but found that he could not get it on one page, so that he wrote in a larger hand on the other two pages. The theory of the contestants was that the scrivener had torn off the first page or pages, and that in order to make the substituted page properly connect in sense with the second page of the will as probated, he was obliged to write the first or substituted page in a more compact manner than the other pages. Experts called by the contestants testified that the first page was written with a finer pen, with a different ink and at a later time than the other pages. Experts called by the proponent flatly contradicted this testimony. It was not shown that the scrivener had any motive for substituting a page, and the will itself in its provisions carried out practically the testator's desires as expressed in other wills which he had made. One witness for the proponent testified that when he saw the will several years before, the first page seemed to have more writing on it, and he thought, but was not positive, that the papers were fastened by a brass fastener instead of a wire staple. *Held,* that an issue was properly refused.

Argued March 11, 1906. Appeal, No. 39, Jan. T., 1906, by Otto Keil et al. from decree of O. C. Luzerne Co., No. 206, of 1904, refusing an issue devisavit vel non in Estate of Christian Keil, deceased. Before MITCHELL, C. J., MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Appeal from register of wills.

FREAS, P. J., filed the following opinon :

Christian Keil died April 17, 1904, leaving a will dated March 25, 1901, whicn was probated April 30, 1904. From the probate of said will an appeal has been taken by the children of testator by his first wife, who allege that the paper probated is not the will of testator but is a paper so materially altered and changed as to entirely defeat and nullify the intention of the testator, in that the first page or pages of said will were destroyed and a page substituted after the will had been signed

by the testator.    The will was written by James Martin and as the first page of the will as probated is also in his handwriting he, if anyone, must have made the substitution.

In proof of their claim of alteration the contestants offer the will itself, which consists of one half sheet of legal cap, closely written upon one side, and one full sheet loosely written upon on the first and third pages, all bound together by two wire staples made from common pins, clinched by a tool for the purpose.    It is contended that Martin tore off the first page or pages and in order to make the substituted page properly connect in sense with the second page of the will as probated, he was obliged to write the substituted page in a much finer hand and in a more compact manner than the other pages were written.    In support of this theory we find that the first page contains 1,404 letters and figures, while on the second page there are only 930 letters.    Contestants called two experts in handwriting, who testified that in their opinion the first page was written with a finer pen, with a different ink, and at a later time than the other pages.    The experts called by proponents flatly contradict those of contestants.    The attempt to prove by the use of chemicals that a different ink was used and at a different time, failed absolutely.    On the whole we are not aided one particle by the expert testimony.    We allowed them wide latitude, greater possibly than we should have permitted, for we think their opinions as to the conclusions to be drawn from the obvious appearances of the different pages are not evidence.

The will was witnessed by Christian Gebhart, who testified in part as follows:  " Q. Now please answer my question, is or is not that the same as when you witnessed it ?  A. I just glanced at the first page, that is all I did.   Q. Well, is that the same ?   A. Why, no, I think there is a little more to it. Q. Did you say that Mr. Keil said at the time that will was signed they were all willed alike ?  A. Yes, sir, he did.   Q. I ask you now if there is any other difference you can find out as to the beginning of it, or where it begins on the page or anything of that kind ?   A. Well, I don't know, only it was handed to me; I looked at the first page and never looked at any more. I did not read it, I just glanced at it.   Q. In the appearance of the first page is there any difference ?   A. I thought it only was about this far."   (Indicating.  And on cross-examination the

witness further testified: "Q. About that far; about twelve lines up? A. Yes, and then I thought there was an open space. Q. Witness shown last page of the will? A. That is the page, yes, sir, that's right. Q. That is the page your signature is on? A. Yes, sir. Q. And Mr. Keil's signature? A. Yes." He further says that the several pages were fastened together when he witnessed the will.

We think the above extracts from Gebhart's testimony conclusively show that although he says he saw only the first page he really had in mind the last page, which page is not in dispute.

The other witness to the will is Baltzar Jozwiak, who testified in part as follows: "Q. At the time the will was signed by you as a witness, whether or not you read it? A. Yes, sir, I did. Q. In whose presence did you read it? A. Mr. Keil's and Christian Gebhart's. Q. Did you read it aloud? A. No, sir. Q. Now I wish you would examine the will and state to the court whether or not that will is as it was when you witnessed it? A. Why, as far as I can understand, this first page don't seem to me that there was so much writing on it, that's all I know about it. Q. Whether or not that is the same will? A. Yes, sir, that is the same will but, but that page don't seem to me there was so much writing on it when I witnessed the will. Q. Well, is that the page or is it not that was on when you witnessed the will? A. I don't think so. Q. This Henry Stark you speak of is the man he gives a house and lot to up there? A. Yes, sir, he told me that before I ever signed the will that he was going to give that to him. Q. And Keil spoke to you of the fact that he was going to make his will some time before? A. Yes. Q. You say you don't think that at that time it was fastened the same as it is now. A. No, I don't think so, I ain't positive. Q. Referring to the will as it was before the probate papers were attached, I ask the witness if he thinks it was fastened at the time he witnessed the will with the wire staples? A. I imagine it was fastened with a brass fastener. Q. Was it fastened the way it is now? A. I say I don't think so."

If an issue is granted it must be principally upon the evidence of Jozwiak above quoted. The substance of it is that the first page seems to him to have more writing on it, and he

thinks, but is not positive, that the papers were fastened with a brass fastener. As he witnessed the will March 25, 1901, and did not see it again until after April 30, 1904, it is very unlikely that he would carry these details in mind with any degree of certainty. The witness is undoubtedly honest in his testimony and gives his impressions as he recalls them. We think it evident from an inspection of the will even after being handled as much as it has been, that the papers disclose no evidence of brass fasteners ever having been through them. We think it would be possible to remove the pin staples but it would be necessary to insert others just like them to leave no trace. Although Jozwiak read the will at the time he witnessed it and had known the parties to it for eighteen years, yet he does not speak of any change in its contents, which we think he would be more likely to remember than its appearance. He testifies that Keil told him that he was going to give the house and lot to Henry Stark, and this devise appears on the page in dispute.

James Martin, who wrote the will, is married to a daughter of the woman who is mentioned in the will as testator's wife. He was formerly sheriff of Luzerne county, and is now a mine inspector. He is a man of considerable intelligence but of little education. He testified that when Keil asked him to write the will Keil gave him two former wills which had been drawn by Squire Cox and directed him as to the contents; that he wrote the will next morning at his own house, with the Cox wills before him, and endeavored to write it all on a half sheet of paper as the Cox wills were written, but discovered when he had finished the first page that by reason of the description of land given to Henry Stark, which description was not in the Cox wills, he could not get it all on both pages of the single half sheet. He then took a full sheet and having more space at his command he wrote in a fuller and freer hand. He is not certain whether he completed it without getting up, or whether he used more than one pen, as he had several on his desk, but is positive that he used the same ink throughout, and that the will as probated was written that morning and that it was not afterwards mutilated; that afternoon he gave it to Keil and did not see it again until it was probated. Mrs. Keil testifies that Keil placed it in a tin box

in which he kept his papers in his bedroom, and after his death it was delivered to Attorney Conniff.

Christian Keil, the testator, came to this country in 1868, after the death of his first wife, by whom he had the children who are now the contestants. He had been acquainted in Germany with Mrs. Elizabeth Noll, who is the mother of the proponents, and who came here in 1869, followed shortly afterwards by her children, who for some reason unknown to us are called Stark. Soon after her arrival Mrs. Noll became testator's housekeeper, and on June 4, 1877, they were married (she giving her maiden name as Elizabeth Appel), and they lived together as husband and wife until his death. Contestants contend that this marriage was illegal by reason of the fact that Noll did not die until about 1900. Proponents offered in evidence a decree of divorce of a German court dated March 31, 1874, of John Noll from his wife Elizabeth, nee Apple, on the ground of malicious desertion. This record was objected to for the reason that it was not an exemplification of the whole record of the proceedings of which the record offered is a part, and this objection we now sustain. So far as this case is concerned, whatever may be the truth of the matter, Mrs. Noll is not the legal widow of testator; but if he died testate this fact is not now important. That he regarded her as his legal wife cannot be questioned, as he publicly held her out as such, they acknowledged deeds together, and in all his wills he speaks of her as his wife, and in two of his wills his bequests are stated to be in lieu of dower if she should so elect.

In Wikoff's Appeal, 15 Pa. 281, where an issue was demanded to determine whether a part of a will had not been suppressed, it was held that the presumption of innocence is favored by the law, and as it would be criminal in a stranger to filch and suppress a part of a will, the presumption would be that the missing bequest had been canceled by the testatrix herself. So in our case, notwithstanding the peculiarities of the first page of the will, we must start with the presumption that no change or substitution has been made. Crime is sometimes committed without any apparent motive, yet it is almost inconceivable that a crime of this nature would be perpetrated without the hope of benefiting someone very materially. If a substitution was made, James Martin did it, and we naturally look to the

beneficiaries mentioned on the first page to see in whose interest this alleged crime was committed, and we find that the widow and Henry Stark are the only ones therein preferred. The testator had executed two other wills with which Martin had nothing to do, and a comparison of the three wills is instructive of the testator's intentions.

It is true that the making of a new will is evidence of some change in testator's intention, but here the general scheme of distribution is the same in the second and third wills. In both these wills Henry Stark is given the saloon property, but in the last will upon more favorable terms. In the second will and in both the disputed and undisputed pages of the last will testator divides the remainder of his estate equally among his own and his stepchildren, except Henry Stark. The provision for the widow in the last will is less favorable than in the former will; he gives her a life estate in all his real estate and his personal property absolutely in the last will, but there is no evidence that he possessed any personal estate. If it were the testator's intention in making a new will to prefer his own to his stepchildren it is strange that he should have selected the husband of his stepdaughter to draft the will when he did not consult him in making the other wills, and have given him the wills in which all the children except Henry were made equal to copy from. It requires no comment to show that this supposed crime could not have been committed in the interest of the widow. Keil told Jozwiak that he intended to give the saloon property to Henry, and the will was witnessed in Henry's saloon. He told Gebhart that "they were all willed alike," which is true as to all except Henry. By reason of the preference of Henry Stark the scrivener's wife suffered as much as the other children.

There is no evidence of the commission of a crime here and no proof of any motive. We have only the peculiarities of the first page, the opinions, not well founded, of two experts, and the faint impressions of the appearance of the paper of a witness to the will. As against the presumption of innocence, the contents of his other wills and his declared intentions, we do not think that a dispute within the meaning of the act allowing an issue has arisen. We are not without difficulty in reaching a conclusion as to whether an issue should be granted

in this case, but we do not think that suspicion and opinion can be substituted for proof of facts.

*Error assigned* was decree refusing the issue.·

*John M. Garman*, with him *Harris B. Hamlin*, for appellant.

*S. J. Strauss*, with him *T. M. Conniff*, for appellee.

PER CURIAM, May 24, 1906 :
Decree affirmed on the opinion of the court below.