# Fleming's Estate.

*Wills—Probate—Forgery—Issue devisavit vel non—Refusal of issue—Constitutional law—Trial by jury—Act of March 15, 1832, P. L. 146.*

1. A dispute as to the facts such as to require the granting of an issue, under the Act of March 15, 1832, P. L. 146, must be a substantial dispute and the evidence, considered as a whole, must be such as would sustain a verdict in favor of the party praying for the issue. Such party is usually the contestant but the rule is the same as to the other side, and, where the trial judge after a careful review of all the testimony would feel constrained to set aside a verdict, if in favor of one side, as contrary to the manifest weight of the evidence, the issue should be refused.

2. In a will contest the judge sits as a chancellor, and must consider all the evidence; and the question is not whether a part of the evidence, standing alone, would support a certain verdict, but whether it would be considered as a whole.

3. The right to an issue under the statute depends upon whether there is a substantial dispute upon a material matter of fact, and unless there is, the proponent is no more entitled to an issue on a question of forgery than is the contestant on a question of testamentary capacity. The statute does not confine the dispute to any particular question.

4. The orphans' court within its jurisdiction is a court of equity, although not technically so called, and proceedings therein on will contests are, as a rule, equitable in form and substance. The usual grounds upon which such contests are based, to wit, "lack of testamentary capacity," "undue influence," "fraud" and "forgery" are of equitable cognizance; and for either, when satisfactorily proven, chancery may decree the cancellation of a written instrument. Fraud, of which forgery is a glaring example, is one of the principal grounds of equity jurisdiction, and, as a general rule, equity may decree the cancellation of a written instrument found to be a forgery.

5. When the court is considering the validity of written instruments as affected by undue influence, fraud, forgery or incapacity, it is considering equitable questions wherein jury trials are not, and were not, when our first state constitution was established, a matter of right; and its declaration that "trial by jury shall be as heretofore," has no application to cases where such trial was not then demandable. There is no common law right to a trial by jury in a will contest.

6. The Act of March 15, 1832, P. L. 146, deprives no one of a constitutional right. The fact that it has stood the test of eighty-seven years is strong persuasive evidence of its constitutionality.

7. An issue devisavit vel non will be refused, where the court finds that the testator neither wrote nor signed the will, that it contained misspelled words and names not consistent with his education and knowledge; that it did not carry out his expressed intentions as to the disposition of his estate; that it was not produced until six years after his death; that the story told as to the delay in producing it was highly improbable; that the signature of one of the three witnesses was proved to be a forgery; that there was evidence of the spurious character of the signature of the second witness; and that the presumptive beneficiary under the will was a remote kin, as to whom the testator had never made any declarations that he intended to make her his principal beneficiary, and as to whom there was no reason why he should do so.

Argued May 6, 1919. Appeal, No. 184, Oct. T., 1918, by Clara Belle Fleming, from decree of O. C. Allegheny Co., March T., 1917, No. 338, setting aside will and refusing an issue devisavit vel non in Estate of Joseph K. Fleming, deceased. Before BROWN, C. J., MOSCHZISKER, FRAZER, WALLING, SIMPSON and KEPHART, JJ. Affirmed.

Appeal from register of wills. Before TRIMBLE, J.

The court entered a decree setting aside the will and refusing an issue. Clara Belle Fleming appealed.

*Error assigned* was the decree of the court.

*Thos. M. Marshall, Jr.,* with him *Thos. M. Marshall,* for appellant.—The orphans' court is not invested with the power to set aside a duly probated will: Crawford v. Schooley, 217 Pa. 429.

The adverse testimony produced by the contestants was very meager. The will is a natural one, and on its face bears inherent evidence, very strong and convincing, that it is a genuine will.

The court erred in itself deciding that this will was a forgery, and in refusing to grant an issue to the common pleas court: Miller's Est., 179 Pa. 645.

*George E. Alter,* of *McKee, Mitchell & Alter,* with him *Mehard, Scully & Mehard, Forest G. Moorhead, John W. Dunkle* and *Eugene Mackey,* for appellee.—The court properly exercised its power in refusing an issue, reversing the register and striking down the will: Sharpless's Est., 134 Pa. 250; Phillips's Est., 244 Pa. 35; DeHaven's App., 75 Pa. 337; Harrison's App., 100 Pa. 458; Herster v. Herster, 116 Pa. 612; Roup's Est., 236 Pa. 31; Conway's Est., 257 Pa. 314; Roberts v. Clements, 202 Pa. 198; Robinson v. Robinson, 203 Pa. 400.

OPINION BY MR. JUSTICE WALLING, October 6, 1919:

This appeal is by a proponent from the decree of the orphans' court revoking the probate of a will and refusing to grant an issue devisavit vel non. Joseph K. Fleming, a resident of Pittsburgh, died June 29, 1909, at the age of sixty-four years, unmarried and without issue. He left an estate of about $200,000 and as his next of kin remote collateral relatives. He had destroyed a will three weeks prior to his death, and, on proof of intestacy, letters of administration were granted upon his estate. In the fall of 1916 there was presented for probate a paper as follows:

"Pittsburgh, Pa., June 23, 1909.

"I, Joseph K. Fleming being of sound mind and understand do make my last will and testament revoking all other wills heretofore made.

"I direct that my just debts and funeral expenses be paid.

VOL. CCLXV—26

"I also direct that $10,000 dollars be paid to Mrs. Marshell Brown, I do this through request of my sister, Jane.

"I will the balance of my personal property and all of my real estate and belongings to Clara Bell Fleming of Butler, Pa., and I direct that Clara Bell Fleming take good care of the Fleming valt in the Allegheny cemetery.

"I also direct that none of the McCauleys nor any of my mothers kin shall have one dollar of my property, real or personal.

"I also direct that Flora Josephine Fleming shall not have any of my property.

"I hereby appoint Clara Bell Fleming of Butler, Pa., and W. J. Gillmore of Pittsburgh, Pa., to execute my will.

"Signed and sealed this 23rd day of June 1909.

"JOSEPH K. FLEMING.   [Seal.]

"Signed and sealed in the presence of

"W. J. GILMORE,

"R. B. BAUM,

"J. J. MOORE."

After a contest, in which testimony was submitted by proponents only, the register admitted it to probate, and the contestants, as Mr. Fleming's next of kin, thereupon took an appeal to the orphans' court, on the contention that the purported will was a forgery. From a decree of that court, sustaining such contention, Clara Belle Fleming, the principal beneficiary thereunder, brought this appeal.

Each side submitted to the orphans' court a large amount of evidence; that for proponents included the testimony of Mrs. Mary Jane McCauley to the effect that, in the spring of 1910, while residing in the Fleming homestead, she found the will, also a copy thereof, and $50 in a tin box concealed in the chimney of an abandoned fireplace, and kept the will until September, 1916, when she left it in the office of appellant's attorney. Meantime two of the alleged witnesses, Gilmore and Baum, had died; but their signatures and also the signature and handwriting of Mr. Fleming (the will pur-

porting to be holographic) were identified by bankers and others qualified to express opinions thereon. Mr. Moore, the third witness, testified to having subscribed his name thereto in the presence of Fleming and Gilmore. Proponents also called Mr. Malone, a handwriting expert, who expressed the opinion that the document and signatures were genuine; however, he qualified his testimony somewhat on cross-examination.

In 1910 appellant employed one Frank U. Morton on a percentage basis to look after her interest, whatever it might be, in the estate in question, which he proceeded to do; and about 1915 caused an action of ejectment to be brought on behalf of herself and sister, for the Fleming real estate, on the assertion that they were the nearest heirs of decedent. However, in August, 1916, a month before that case was listed for trial, they became satisfied that such suit must fail, as there were others more closely related to Mr. Fleming. Shortly after this discovery it was intimated that he left a will, under which appellant was a beneficiary, that had been surreptitiously destroyed; and in the following month (September, 1916) her petition was presented in the ejectment suit praying for leave to amend her claim so as to base it on the lost will. At the same time there was a further intimation that the will had been found and a few days later it was left at the attorney's office, Morton meantime having secured genuine signatures of Gilmore and Baum. He had borrowed from Samuel Dempster a receipt with Gilmore's genuine signature, and when returned it showed the marks of a sharp instrument as if the signature had been traced; and of that signature Gilmore's name as a witness to the will is practically a reproduction. The latter when examined under a microscope shows carbon along the edges and bears every mark of being a traced signature. Just ten days after the will purports to have been executed, Mr. Gilmore, a man of undoubted character, went before the register, made oath that Fleming had died intestate and was one of the parties to whom

letters of administration were first granted. The conclusion is unavoidable that his signature to the will is a forgery. The evidence as to the spurious character of Baum's signature, standing by itself, is less convincing.

A careful examination of the record leads to the firm conviction that Mr. Fleming neither wrote nor signed the will in question. He died suddenly and to the end was in full possession of his faculties. He was a good English scholar, had been a telegraph operator and was an excellent speller; yet the will contains five misspelled words, all simple, and two being the names of intimate friends. Aside from that the will is not in his handwriting. This appears not only from the opinions of experts and of lay-witnesses familiar with his writing but clearly from a comparison of the will with specimens of his genuine penmanship; in fact the will bears no marked resemblance to his handwriting. The word "Fleming" appears nine times in and upon the will, all strikingly similar, yet none of them appears to resemble any one of his many genuine signatures in evidence. The will on its face bears evidence of having been written with a studied effort and not naturally. It is not in harmony with Mr. Fleming's expressed intentions as to the disposition of his estate. It was his cherished purpose, often mentioned, to establish a home for crippled children by the devise of his residence for that purpose, with a proper endowment to equip and maintain the same, but that is not found in this will. Appellant's kinship to him was remote and while naturally she might be remembered in his will, and he had probably said she would be, he had never, so far as appears, declared an intention of making her his principal beneficiary, nor was there any reason why he should do so. Mrs. Brown was a friend of the family and the legacy to her was probably inserted as a makeweight to support the will which purports to give what amounts to 95 per cent of the estate to appellant.

Mr. Fleming had kept his former will in the bank with other valuable papers and, as he was an intelligent man

of good judgment, the suggestion that he would keep his will, disposing of a $200,000 estate, concealed in a chimney, where it might easily be destroyed or never discovered, is highly improbable; as is the weird story of Mrs. McCauley about guarding the will so carefully for a year and a half and then placing it with a dress in a trunk and forgetting all about it for years and then unable to recall where it was until accidentally discovered, etc. Considering all the circumstances, including her own admissions of wrong-doing, the court below was justified in disregarding her testimony.

On behalf of proponents, Moore and Morton account for the presence of carbon on the signatures of Gilmore and Baum by saying they were first written in pencil and then traced in ink, and Mrs. McCauley states that she thoughtlessly traced them in pencil while in possession of the will; but neither explanation is convincing. There was also the testimony of Mrs. Lamker that Mrs. McCauley had shown her the will on several occasions; also other evidence that the will was seen before Morton obtained the signatures as above stated. There was evidence that Gilmore and Baum made declarations to the effect that they were witnesses to Mr. Fleming's will. Mrs. McCauley refers to an unposted letter, which she says she found under the carpet, written by Mr. Fleming to appellant on the day of his death, and making reference to a will radically different from the one here at issue. The real question is not whether he made a new will but whether he made this will. The contention that he made another will, if true, does not prove that this one is genuine. Such other will may have been lost or destroyed. The court below saw and heard the witnesses and their explanations of the numerous photographs and other exhibits, a decided advantage especially in weighing testimony depending largely upon reasons shown and demonstrations made, and found the will was a forgery, and that on the entire evidence a verdict in its favor could

not be sustained; hence, it set aside the probate and refused to grant an issue as prayed for by proponents.

The case was well considered and in our opinion properly decided. A dispute as to the facts such as to require the granting of an issue, under the Act of March 15, 1832, P. L. 146, 4 Purdon (13th ed.) p. 4088, must be a substantial dispute and the evidence, considered as a whole, must be such as would sustain a verdict in favor of the party praying for the issue. Such party is usually the contestant but the rule is the same as to either side, and, where the trial judge after a careful review of all the testimony would feel constrained to set aside a verdict, if in favor of one side, as contrary to the manifest weight of the evidence, the issue should be refused. See Conway's Est., 257 Pa. 314; Roup's Est., 236 Pa. 31; Fuller's Est., 222 Pa. 182; Knauss's App., 114 Pa. 10; Harrison's App., 100 Pa. 458. To grant an issue the evidence must be such as would sustain a verdict for either party, otherwise there is no substantial dispute upon a material question of fact. See Phillips's Est., 244 Pa. 35, 44; Wilson v. Mitchell, 101 Pa. 495. A prima facie case upon one side may be so overcome by opposing proof as to leave no substantial dispute: Sharpless's Est., 134 Pa. 250, 259.

In a will contest the judge sits as a chancellor (Roberts v. Clemens, 202 Pa. 198; McCormick v. McCormick, 194 Pa. 107) and must consider all the evidence; and the question is not whether a part of the evidence, standing alone, would support a certain verdict but whether it would considered as a whole: Keller v. Lawson, 261 Pa. 489. "In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury—it must as a whole be judged by him independently of the jury—must satisfy his (legal) conscience as well as the jury—and cannot be rightfully submitted to the jury as a basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he as a chancellor

(after weighing the evidence in the light of the established law upon the subject) would not do": Phillips's Est., supra, p. 42; Caughey v. Bridenbaugh, 208 Pa. 414, 415; Robinson v. Robinson, 203 Pa. 400.

The right to an issue under the statute depends upon whether there is a substantial dispute upon a material matter of fact, and, unless there is, the proponent is no more entitled to an issue on a question of forgery than is the contestant on a question of testamentary capacity. The statute does not confine the dispute to any particular question. See Fuller's Est., supra; Douglass's Est., 162 Pa. 567; Sharpless's Est., supra. The orphans' court within its jurisdiction is a court of equity (Johnson's App., 114 Pa. 132, 139), although not technically so called, and proceedings therein on will contests are, as a rule, equitable in form and substance. The usual grounds upon which such contests are based, to wit, "lack of testamentary capacity," "undue influence," "fraud" and "forgery" are of equitable cognizance; and for either, when satisfactorily proven, chancery may decree the cancellation of a written instrument. Fraud, of which forgery is a glaring example, is one of the principal grounds of equity jurisdiction, and, as a general rule, equity may decree the cancellation of a written instrument found to be a forgery: 9 Corpus Juris, 1195; 4 Ruling Case Law, p. 498; Penna. Co. for Ins. on Lives, etc., v. Franklin Fire Ins. Co., 181 Pa. 40; Leigh v. Everheart's Ex'r, 16 Am. Dec. (Ky.) 160-162; Mactavish v. Kent, 122 Mich. 242; Cutler v. Fitzgibbons, 148 Cal. 562; Ritterhoff v. Puget Sound Nat. Bank, 37 Wash. 76 (107 Am. State Rep. 791); Vannata v. Lindley, 92 Am. State Rep. (note), p. 272; and see Eckman v. Eckman, 55 Pa. 269, 273.

When a court is considering the validity of written instruments as affected by undue influence, fraud, forgery or incapacity, it is considering equitable questions where in jury trials are not, and were not when our first state constitution was established, a matter of right; and its

declaration that "trial by jury shall be as heretofore," has no application to cases where such trial was not then demandable: Smith v. Times Pub. Co., 178 Pa. 481; Byers and Davis v. Com., 42 Pa. 89, 94; Van Swartow v. Com., 24 Pa. 131, 133; W. Va. P. & P. Co. v. Public Service Com., 61 Pa. Superior Ct. 555, 568. And in England, until the court of probate was created by statute in 1857 (40 Cyc. 1248), wills were proven and will contests tried in the ecclesiastical courts, to which the right of trial by jury did not extend: Sharswood's Blackstone, vol. 2 (Book III), pp. 61-65, 97-101. See also Chitty's General Practice, vol. 1, pp. 522-524; 1 Williams on Executors, *236. "Unless provided by statute the parties to a contested will case have no right to a trial by jury": 6 Am. & Eng. Enc. of Law (2d ed.), p. 979; and the same rule applies generally in probate courts: Ibid, p. 979; see also 24 Cyc. 104. Hence, the above cited Act of 1832, as construed by this court, deprives no one of a constitutional right. The fact that it has stood the test of eighty-seven years is strong persuasive evidence of its constitutionality.

In Crawford v. Schooley, 217 Pa. 429, relied upon by appellant, a will of the testator was duly probated; from which an appeal was thereafter taken to the orphans' court on the ground that a will of later date had been found, and a request was made for an issue to determine the validity of the latter. After hearing, the petition for an issue was refused and the appeal dismissed by the lower court on a finding that the later will was a forgery. We held that as it had never been offered for probate the question of its authenticity was not before the orphans' court and that the adjudication thereof was premature and coram non judice: and that the testimony of the subscribing witnesses made a prima facie case in its favor on which the orphans' court should direct the register to open the probate of the earlier will, so that the one of later date might be offered for probate and its authenticity determined before the register and on appeal by

the orphans' court, etc.  The question of the right of a proponent to an issue on the testimony of the subscribing witnesses was not before this court nor decided, as the appeal was from the probate of the earlier will. What was said as to that perhaps should have referred to such testimony making a prima facie case before the register and on appeal; for the right to an issue depends on the entire evidence and not on that of any particular witnesses.

In Douglass's Estate, supra; Berg's Est., 173 Pa. 647; Masson's Est., 198 Pa. 636; Malunney's Est., 208 Pa. 21, and Keil's Est., 215 Pa. 464, after weighing conflicting evidence as to alleged forgery in a will, the courts below refused an issue, and we affrmed; while in Sharpless's Estate, supra, on a like charge, we reversed, stating that, "looking at the whole evidence as put before us in print, we do not think we can safely say the balance is not doubtful," and significantly adding that the trial judge would, after hearing all the evidence, "still have the final result within his control"; also see Byerly's Est., 258 Pa. 410, where the orphans' court set aside the probate of a will on the ground that the testator's signature had been forged.  In the case last cited it is held that the orphans' court has no power to grant an issue in a will contest, even on a question of forgery, unless there is a request therefor.  However, in the present case there was a request for a jury trial but we are not prepared to hold that its refusal was error.

The assignments of error are overruled and the decree is affirmed at the costs of appellant.

DISSENTING OPINION BY MR. JUSTICE SIMPSON:

The register of wills of Allegheny County admitted to probate an alleged will of Joseph K. Fleming disposing of both real and personal property; his heirs and next of kin appealed to the orphans' court, alleging the signature was a forgery, and praying the admission to probate should be reversed; proponents' answer denied the alle-

gation of forgery, and prayed the decision of the register be affirmed, or an issue be sent to the court of common pleas for a trial by jury; the court below revoked the decree of probate, refused an issue, and struck the will from the records, and from that judgment proponents appealed.

The paper purports to be witnessed by three persons, two of whom died between its alleged date and the time of trial. The surviving witness testified the signature was decedent's; and other witnesses were called to prove his signature and those of the two deceased subscribing witnesses, resulting, as stated in the opinion of the court below, that a "prima facie case for the proponents was made out by proof of their handwriting." Under such circumstances we held in Crawford v. Schooley, 217 Pa. 429, 435: "when the subscribing witnesses to a will testify to its due execution, an issue to determine the genuineness of the instrument, if requested by the proponent, is a matter of right." It is true this conclusion is obiter dictum, but it was stated by us as advice to the court below in the trial of an issue which had been requested, was concurred in by the entire court then sitting, including two of the present judges, and is in effect our decisions in Barker v. McFerran, 26 Pa. 211; Vernon v. Kirk, 30 Pa. 218; McGeary v. McGeary, 1 Sadler 297, and Rees v. Stille, 38 Pa. 138, 143, in the last of which we pointed out that "proof of facts necessary to constitute authentication, is not to be confounded with proof of mental soundness, or freedom of the will."

Moreover, it is sound in principle; for a will being proved in the manner prescribed by statute (Act April 8, 1833, Sec. 6, P. L. 249), as confessedly this was, is always admissible in evidence, and its effect cannot be overcome, as a matter of law, by oral evidence, which is necessarily for a jury's consideration. No valid reason exists, and none is anywhere suggested, why a different rule should apply in the case of a will, from that in the case of a note, deed, or other written instrument, where

the only question is the validity of the signature thereto. On the contrary, the authorities establishing the rule relied on by the court below, base it on the analogy between the two classes of cases (Bradford's Will, 1 Parson's Select Equity Cases 153; DeHaven's App., 75 Pa. 337, 341); and, apparently recognizing that it can have no other basis, the majority opinion says "where a court is considering the validity of written instruments as affected by undue influence, fraud, forgery or incapacity, it is considering equitable questions wherein jury trials are not......a matter of right." Many cases so hold where the signatures are admitted or proved, and the written instruments are attacked for "undue influence, fraud......or incapacity"; but it is sufficient to refer to Church v. Ruland, 64 Pa. 432; McDonald v. McAndrew, 40 Pa. Superior Ct. 146, per RICE, P. J., and Monticelli v. Rosenthal, 193 Pa. 545. In principle this is sound, for capacity and knowledge of and assent to the contents of a writing, are all inferred from the admission or proof of the signature. On the other hand there is no presumption as to the validity or invalidity of the signature itself, and hence the law in regard thereto should be and is the reverse thereof. It is sufficient, however, for the present moment, that the majority assert that the same rule should be applied in all cases "where a court is considering the validity of written instruments"; and our immediate inquiry therefore is: What are the legal rules applicable to such controversies?

What the legislature meant by the language "Whenever a dispute upon a matter of fact arises......the court shall at the request of either party direct a præcipe for an issue to the court of common pleas of the county for the trial thereof" (Sec. 41, Act of March 15, 1832, P. L. 146) ought not to be difficult of ascertainment. As no method is prescribed for determining whether or not it is a real dispute or only a pleaded one, it is evident the principles applicable to cognate cases should be applied, and not that the matter should be within the discretion

of a trial judge, as was the result here; for otherwise
we convict the legislature, when it said an issue shall be of
right "whenever a dispute upon a matter of fact arises,"
of meaning that it shall never be of right but always of
discretion; a legal discretion, if you choose, but none the
less a matter of discretion. The majority opinion, as
shown above, recognizes the fallacy of so holding, and
in the endeavor to bring itself within the principle stated
further says: "Fraud, of which forgery is a glaring ex-
ample, is one of the principal grounds of equity jurisdic-
tion, and, as a general rule, equity may decree the cancel-
lation of a written instrument found to be a forgery."
This is stated evidently for the purpose of establishing an
analogy to the language of the statute which gives equity
"jurisdiction on the grounds of fraud, accident, mistake
or account." It is true in the sense that it is an attempt
to wrong another, forgery is a fraud. But in the same
sense every other attempt to wrong another is "fraud."
Hence, if fraud in that sense is sufficient to furnish a
basis for equitable jurisdiction, perhaps no disputed
cases, other than those having for their sole purpose the
construction of writings, the terms of which are ad-
mitted, would be subject compulsorily to the "trial by
jury" provisions of our Constitution. Of course this can-
not be so, and hence in this country, where we have writ-
ten constitutions guaranteeing jury trials, equity's juris-
diction on the subject of "fraud" is greatly limited.

In 6 Cyc. 292-3 it is said: "As a general rule, sustained
by a preponderance of authority, a suit will not be sus-
tained to cancel a nonnegotiable instrument, to which a
defense may be made in an action at law thereon, unless
some substantial reason is assigned showing the defense
at law is an insufficient protection. This is especially
true where an action at law upon the instrument is
actually pending." In 10 Ruling Case Law 318-19, it is
said: "The great majority of the later American cases,
however, restrict courts of equity to narrower limits in
cases of fraud than does the English doctrine on the sub-

ject, by considering inadequacy of the remedy at law, and not the existence of fraud, as the true criterion by which the question whether equity will exercise its jurisdiction is to be determined......This so-called American doctrine has resulted partly from the tendency of legislation in that direction......but more prominently from the effect attributed to constitutional guaranties relating to the right of trial by jury, which are commonly construed as constituting an inherent limitation on the jurisdiction of courts of equity."

In this State we have held steadily to the rule thus laid down, as shown by the cases already cited, and by Hyde v. Baker, 212 Pa. 224, 226, where we said: "We do not dispute the general principle, relied upon by the appellee, that where fraud is alleged equity has concurrent jurisdiction with law. In our State, however, the settled rule has never been departed from that equity jurisdiction will not attach where there is a full, complete and adequate remedy at law." It is perhaps unnecessary to point out that a will can only be contested in the method prescribed by statute and the judgment in the case is conclusive upon the parties thereto and their privies, and hence there is not only a full, complete and adequate remedy at law, but it is the only remedy. If it be suggested that the proceeding is nevertheless of an equitable nature and hence equitable principles must be applied in the trial thereof, the answer is, not only does that beg the question, and, as applied here, modify the above-quoted language of the Act of 1832 providing for an issue where facts are really in dispute, but it goes much too far; for in that event, in all actions at law to recover money or property alleged to have been wrongfully withheld, the same rule would have to be applied, and the right of a jury to determine the facts would be almost wholly destroyed in the great body of our civil actions. In an ordinary suit, akin to the present one, no one would ever apply such a principle in determining the case. For instance, if the suit were upon a due-bill, the signature to

which was alleged to be a forgery, and one of the subscribing witnesses testified he saw the maker sign it, the signatures of the other two were proved by eleven witnesses and that of the maker by eight witnesses, would binding instructions for defendant be sustained because the trial judge did not believe the maker's signature was genuine, and discredited also some of the other witnesses for plaintiff? Clearly not; yet we would have to so hold, if the principle contended for in the majority opinion were applied thereto.

I concede "as a general rule, equity may decree the cancellation of a written instrument found to be a forgery," subject to the exception hereinbefore noted that the "general rule" does not apply, where, as here, there is a full, complete and adequate remedy at law; but there are also other insuperable obstacles to apply the "general rule" in cases of contested wills. If the forgery was personally known to the alleged testator, he could, if competent, clear up the matter by another will,—containing, if he chooses, merely a clause of revocation,—except in those rare cases where the alleged will would be irrevocable because contractually made upon sufficient consideration, in which event I have no doubt he could maintain a bill quia timet. So, too, it would lie at the instance of anybody in interest, if the alleged testator was incompetent. If the paper becomes known after his death, sections 7 and 8 of the Act of March 15, 1832, P. L. 136, and sections 8 and 9 of the Act of June 7, 1917, P. L. 415, provide a complete remedy to compel the production of the document, after which a caveat duly prosecuted would result in a conclusive determination of the question of validity, either by a decree of the register of wills or the orphans' court, or by judgment on the verdict of a jury after issue awarded. From such a proceeding the parties claiming under the alleged will could not withdraw, nor could they enter a discontinuance or suffer a nonsuit. In every contingency, therefore, we have a statutory proceeding, providing a complete and therefore

an exclusive remedy: Section 13, Act of March 21, 1806, 4 Sm. Laws 332; Phelps's App., 98 Pa. 546. Moreover, all the authorities agree that the principle quia timet is the only basis of the equitable right to cancel for forgery, and those principles have no relevancy to this proceeding, which is not only statutory and exclusive, but is also more expeditious and at least as efficacious as a bill in equity; and hence, as against it, there is no basis for the "fear" of future wrong, which alone sustains the jurisdiction. If it be again suggested that even if this be true it does not alter the fact that the proceeding is equitable in its nature, then, it is repeated, the considerations set forth in the last paragraph hereof also answer the renewed suggestion.

Moreover, there is a constitutional difficulty standing in the way of the majority opinion. By Article IX, Section 6, of our Constitution of 1790, by the same article and section of our Constitution of 1838, and by Article I, Section 7, of our Constitution of 1873, it is provided: "Trial by jury shall be as heretofore, and the right thereof remain inviolate." This does not prevent the legislature or the courts from providing preliminary methods for ascertaining whether or not there are pertinent facts actually in dispute (Lawrence v. Borm, 86 Pa. 225; Smith v. Times Publishing Co., 178 Pa. 481; Nugent v. Phila. Traction Co., 183 Pa. 142); so always, however, that if their resolution one way or the other would be conclusive, and there is evidence to support each view, a "trial by jury" is of right (except where the Constitution itself has modified the right), if, prior to the adoption of the constitutional provision, it was a matter for a jury to decide: Byers v. Com., 42 Pa. 89; Rhines v. Clark, 51 Pa. 96; Haines v. Levin, 51 Pa. 412; Cutler v. Richley, 151 Pa. 195; Penna. Co. v. Ohio River Junction R. R. Co., 204 Pa. 356.

As early as Emerick v. Harris, 1 Binney, 416, 424, we said: "The legislature cannot constitutionally impose any provisions substantially restrictive of the right of

trial by jury. They may give existence to new forums; they may modify the powers and jurisdictions of former courts, in such instances as are not interdicted by the Constitution from which their legitimate powers are derived. Still, the sacred, inherent right of every citizen, a trial by jury, must be preserved. 'It shall remain inviolate, as heretofore.' " In North Penna. Coal Co. v. Snowden, 42 Pa. 488, 491-3, we said: "If there is any right to which, more than all others, the people of Pennsylvania have clung with unreleasing grasp, it is that of trial by jury. They brought it with them from the land of their fathers. In every constitution which has been adopted, they have taken care to secure it against infringement, and put it beyond the power of either the executive, the legislature or the courts to take it away from any individual......The judiciary, no more than the legislature, can deny to any litigant the right of trial by jury, in a case appropriate to such a mode of trial."

Such quotations might be multiplied many times, but the above is more than sufficient to show that, under this provision of the Constitution, if standing alone, the legislature would have no power to deny litigants a right of trial by jury, if controlling facts are shown to be in dispute, and the courts have no power by construction to extend an act beyond that point, if the right to a jury trial thereof existed at the time the Constitution of 1790 was adopted. What then was its status at that time? for, as we said in Van Swartow v. Com., 24 Pa. 131, 133-4: "Every class of cases triable by jury in 1790, are still triable in no other way." This question is not a debatable one, for it is covered by Section 11 of the "Declaration of Rights" of the Constitution of 1776, which was in force when the Constitution of 1790 was adopted, viz: "That in controversies respecting property, and in suits between man and man, the parties have a right to trial by jury, which ought to be held sacred." It is true by section 24 of the "Plan or Frame of Government" of the same Constitution, the courts were given "the powers of

a court of chancery so far as relates to perpetuating testimony, obtaining evidence from places not within the State, and the care of the persons and estates of those who are non compos mentis, and such other powers as may be found necessary by future general assemblies, not inconsistent with this constitution"; but that provision is immaterial here,—except in so far as it is antagonistic to the majority under the maxim expressio unius est exclusio alterius,—inasmuch as no other powers were "found necessary by future general assemblies" while the Constitution of 1776 remained in force; and, if they had been, they could not have affected the right of trial by jury, for that would have been "inconsistent with this constitution."

It follows from the foregoing that, considering only the "trial by jury" provision of our several Constitutions, the legislature is powerless, and the courts equally so, to deprive a litigant of a right of trial by jury "in controversies respecting property and in suits between man and man," where facts are really in dispute; and in such cases, therefore, the trial judge, except where the issue is of an equitable nature, would have no right to take the case away from a jury, but only to preside as a common law judge, retaining, of course, his remedy for a wrongful verdict by the granting of a new trial.

This provision of the Constitution, however, did not always stand alone. In 1836 courts of chancery were established in this State, and the Constitution of 1838, in Article V, Section 6, after providing for the perpetuation of testimony, and the care of the persons and estates of those non compos mentis, as in the Constitution of 1790, continued: "and the legislature shall vest in the said courts such other powers to grant relief in equity as shall from time to time be found necessary; and may, from time to time, enlarge or diminish those powers, or vest them in such other courts as they shall judge proper for the due administration of justice." In North Penna. Coal Co. v. Snowden, 42 Pa. 488, 492, we held this pro-

vision must be construed together with the one preserving the right of trial by jury, and hence "must be understood as referring to powers in equity cases, in that class of cases of which chancery had jurisdiction," leaving the right of trial by jury to control all other matters. From this conclusion we have never departed: Tillmes v. Marsh, 67 Pa. 508; Cutler's Est., 225 Pa. 167, 172; Wickham v. Taylor, 225 Pa. 246, 248. Article V, Section 20, of the Constitution of 1873 contains substantially the same provision, and receives, of course, the same construction: Morgan v. Reel, 213 Pa. 81, 85.

From the consideration thus stated it necessarily follows that where the controversy is one "respecting property, and in suits between man and man," and the matter is not properly cognizable in chancery, every litigant has a constitutional right to have the jury pass upon the credibility of the witnesses and the value of their testimony; but where the controversy is of an equitable nature the legislature may provide for its determination by the court without a jury; and the courts, in each class of cases, are bound by the same restrictions. Indeed this has always been the practice in this State, for in the early days, owing to the absence of a court of chancery, equitable actions and defenses were prosecuted and interposed in common law actions, according to the rules of evidence applicable to equitable proceedings. This was shown so fully in Laussatt's "Essay on Equity in Pennsylvania," republished as an appendix to the First Annual Report of the Pennsylvania Bar Association, that nothing can profitably be added thereto. Applying this principle, it follows that inasmuch as there are no equitable considerations involved in determining whether or not a signature is in the handwriting of a given party, our conclusion in Crawford v. Schooley, supra, was strictly correct, and any other would be unconstitutional. On the other hand where the signature to a will, deed, note or other written instrument is admitted or proved, and the attack is on the ground that

the alleged maker was not of sound mind, or was unduly influenced to sign it, it is in legal effect a bill in equity to cancel the instrument for incapacity to execute it or fraud in its procurement, and is a matter within the jurisdiction of chancery. Hence in the former instance the trial judge is not a chancellor, and in the latter he is, and should direct a verdict if in conscience he could not sustain a decision otherwise: Eckman v. Eckman, 55 Pa. 269; Church v. Ruland, supra; Cummins v. Hurlbutt, 92 Pa. 165; Monticelli v. Rosenthal, supra. It is only upon this ground the rule relied upon, but erroneously applied by the court below, can escape the charge of being a piece of judicial legislation, often strongly condemned by us; and is prevented from being antagonistic to the requirement of the statute that in disputed cases of fact "the court shall at the request of either party direct a precept for an issue to the court of common pleas of the county for the trial thereof."

There is nothing in the decisions of this court opposed to the conclusions above expressed. Prior to the Act of April 22, 1856, P. L. 533, Section 7, when probate was granted or refused, it was conclusive only as to the personalty left by decedent, the devisee or heir might have a jury trial in ejectment for the realty, even though he was a losing party to the probate proceedings, whether before the register, the register's court, or on the trial of an issue devisavit vel non; the result therein being only prima facie evidence for the successful party: Spangler v. Rambler, 4 S. & R. 191; Smith v. Bonsall, 5 Rawle 80; Asay v. Hoover, 5 Pa. 21; Thompson v. Thompson, 9 Pa. 234. Since the Act of 1856, the probate or refusal of probate is conclusive as to both personalty and realty, unless an appeal is duly taken: Wilson v. Gaston, 92 Pa. 207; McCay v. Clayton, 119 Pa. 133. But both before and since, the statute always gave an interested party the right to an issue upon showing disputed material facts. The legislature, therefore, has never infringed upon the constitutional provision; and this suf-

ficiently answers the statement: "The fact that it [the Act of 1832] has stood the test of eighty-seven years is strong persuasive evidence of its constitutionality." It is the construction and extension of it after "eighty seven years" in the way attempted in this case, that is unconstitutional, not the act itself.

It is true that in Masson's Est., 198 Pa. 636; Fuller's Est., 222 Pa. 182, and Douglass's App., 162 Pa. 567, testimony of experts that they did not think the signature was that of the alleged testator, was held not sufficient to overcome the positive proof of its validity; in Conway's Est., 257 Pa. 314, that the "testimony was wholly insufficient to support any such finding" that testator had been deceived into signing the wrong paper; and in Sharpless's Est., 134 Pa. 250, where the claim was that the alleged will had been written over testatrix's signature without her knowledge, the court below was reversed and an issue awarded, without referring to the distinction between cases where the signatures were admitted or proved and those where the validity of the signatures were the only issue. It will be noticed, however, that as the question in each case was as to the sufficiency of the evidence to overcome the affirmative proof of validity, the same conclusion would have been reached had the suit been upon a note, deed or other written instrument; and, what is more important, in none of them was the question of the constitutionality of such a conclusion even adverted to, much less decided.

But one other matter is suggested by the majority as tending to support the conclusion reached by it. It is said that "In England until the court of probate was created by statute in 1857 (4 Cyc. 1248), wills were proven and will contests tried in the ecclesiastical courts, to which the right of trial by jury did not extend." This statement is alike immaterial and only partially accurate; immaterial because of our constitutional provisions above quoted, and only partially accurate because it applies only to wills of personalty, questions regarding

the validity of wills of realty being always tried by a jury in ejectment, the probate, if any, being a wholly immaterial matter (40 Cyc. 1247-8). The majority continuing say: "Unless provided by statute the parties to a contested will case have no right to a trial by jury: 6 Am. & Eng. Ency. of Law (2d Ed.) p. 979; and the same rule applies generally in probate cases: Ibid, p. 979; also 24 Cyc. 104." Five authorities are cited to sustain the text: Lavey v. Doig, 25 Florida 611, where it was decided that the constitution of Florida took away the right of trial by jury in such cases; Whipple v. Eddy, 161 Ill. 114, where it was decided that there a jury trial might be waived; Boyd v. Swallows, 59 Ill. App. 635, where it was decided that a jury trial was not demandable on the settlement of an administrator's account; and Wright v. Fultz, 138 Ind. 594, and Schmidt v. Schmidt, 47 Minn. 451, where it was held that in those states a right to a jury trial did not exist in that class of cases at the time the provision of the Constitution relative to jury trials was adopted. There are other authorities to the same effect, but in no case is it even suggested that a jury trial is not demandable where at the time the Constitution declared "trial by jury shall be as heretofore and the right thereof remain inviolate," there was anything even remotely similar to our constitutional provision "that in controversies respecting property, and in suits between man and man, the parties have a right to trial by jury, which ought to be held sacred"; and hence the quotations from the Cyclopædia have no applicability in this State.

I have dealt with the legal question involved at such great length, because of my anxiety that in this and all other matters our decisions may be based upon some defensible legal principle, applicable to all cases in like situation. The majority opinion seems to approve of this desire, though reaching an opposite conclusion, which has, I believe, been shown to be erroneous. Entirely aside from our difference in that regard, however, it is

clear to me the court below erred even if it is right as to the applicable rule of law; unless in will cases the trial judge may curtly reject evidence which for any reason he does not accept as true. That this has been the practical result in the present case is evident, for as to the woman who testified she found the alleged will in decedent's house, the man who acted for appellant, and the only living subscribing witness to the document, the trial judge summarily brushes aside their testimony thus: "A decree dismissing this appeal or awarding an issue based upon the testimony of Mary Jane McCauley and Frank U. Morton, could not be made, because their testimony is false. Nor is the testimony of Moore, who claims to have attested decedent's signature, reliable." This also is the opinion of the majority, reached somewhat more argumentatively; but on the evidence alone a different conclusion might well obtain, supported as their testimony is by that of a number of other witnesses. Moreover, the issue applied for did not depend on the testimony of those witnesses, and should have been awarded entirely aside therefrom.

On the legal conclusion relied upon by the majority, nothing can be profitably added to what we said in Phillips's Est., 244 Pa. 35, at page 41: "An issue devisavit vel non is a matter of right where the existence of a substantial dispute upon a material question of fact is demonstrated to the court by competent evidence, which, under the circumstances of the case, measures in probative force up to the requirements of the law; or, in other words,—as the rule has heretofore most often been put,—when upon a review of all the proofs a verdict against the will could be properly sustained by a trial judge, the controversy must be submitted to a jury, even though the judge should feel that were he sitting as a juror he would not draw the inferences or reach the conclusions contended for by the contestants." It may be added, however, from Sharpless's Est., 134 Pa. 250, 261, where we reversed the court below for refusing an issue in

a case involving forgery : "But, looking at the contestant's
evidence separately, it seems to make a case for a jury;
and, if no counter evidence were adduced, there would
probably be no hesitation as to a verdict. So, on the other
hand, it is equally clear that the proponent's evidence
would not only support, but, uncontradicted, would com-
mand a verdict. Does it, however, so completely meet,
answer, and overthrow the contestant's case as to leave
but a one-sided issue? We cannot say so. Looking at
the whole evidence as put before us in print, we do not
think we can safely say that the balance is not doubtful.
So much depends on the means of knowledge, the interest
or bias, the manner, the character, and the personal
weight which each witness carries as an individual among
his neighbors and in the community, that a jury is the
only appropriate tribunal, in such a case, to determine
which way the balance inclines." No other conclusion is
possible, for if, as required here, a party to the contro-
versy must not only show that material facts are in dis-
pute, but must also convince the trial judge that the ver-
dict should be rendered as requested, then there is no need
for an issue, for the trial judge may find forgery or no
forgery as he views the evidence, and decree accordingly
without the intervention of a jury; and the requirement
that "the court shall direct a precept for an issue" gen-
erally would become a dead letter except in the case of
judges too incompetent or too indolent to have or express
an opinion. Surely "shall" does and should mean "shall"
to all judges alike, leaving to them only the question as
to whether or not there is really "a dispute upon a matter
of fact," which the jury and not the court might resolve
either way.

The will here purports to be signed by Joseph K. Flem-
ing, and to be witnessed by H. J. Gilmore, R. B. Baum
and J. J. Moore. Contestants' claim is that all those
signatures are forgeries, except that of J. J. Moore, who
testified positively as to the execution of the will. His
testimony is strongly challenged, and much has been

argued for and against it, but it cannot be said, from a legal standpoint, to be self-destructive. Judging from the cold type some of contestants' testimony also is not overly strong, and the whole of it is not so overwhelming in quantity or quality, when compared with proponents', even if we give full weight to it and to the suspicious circumstances referred to by counsel, as to compel the conclusion that a chancellor would feel obliged to take the question from a jury and decide it himself.

The signature of Fleming was proved by the cashier and also by the auditor of the Farmers' Deposit Bank; by Dr. Henry R. McKee and Mrs. Flora Josephine Tadder, who had known him all their lives; by H. H. Hungerman, a tenant of Fleming, and Nancy Kuhn, who had lived with him for years; somewhat indefinitely by Rev. H. H. Marlin, who corresponded with him frequently; and by S. C. Malone, a handwriting expert. In addition, Mrs. Annie Brown, wife of Marshall Brown, testified decedent told her he had made a will in her favor. The signature of H. J. Gilmore was proved by his widow and daughter, by James A. Wakefield, Esq., who had been his attorney for over twenty years; by the cashier of the Diamond National Bank where he had an account; by John H. Armstrong, a real estate agent who had known him for over ten years; by Thomas McLanahan, who had traveled with him, and to whom he had written many times; and by S. C. Malone, a handwriting expert. In addition Gilmore told Mrs. Tadder, Frank H. Morton and Mr. Wakefield that he had witnessed such a will for Fleming. The signature of Baum was proved by his wife, his brother, his sister and his niece by marriage, and by S. C. Malone, a handwriting expert. In addition Baum told his wife, Mrs. Brown and G. Wash. Moore, one of contestants' witnesses, that he had witnessed such a will for Fleming.

Only one of these witnesses is discredited either by the court below, or in the majority opinion here. Indeed of the twenty-nine witnesses called to sustain the validity

1919.]				Dissenting Opinion.

of the signature, but the three above-mentioned are discredited in either court. It is safe to say no other case can be found in the books wherein the testimony of so many witnesses, nearly all of them admittedly honest and credible, has been summarily brushed aside, in order to avoid allowing a jury to pass upon a simple "dispute upon a matter of fact." Certainly none has been brought to my attention. At the root of the decision, as I see it, is indignation at a supposed attempt to maintain a forgery. The indignation may or may not have ample justification, but, in my judgment, it should have been held in judicial abeyance until the tribunal established by law to determine whether or not it is "a matter of fact" had finally so decided.