## Dettra Estate

*Otis W. Erisman* and *Frank F. Truscott*, for proponents.

*Herbert W. Salus, Jr.,* and *Sydney J. Fires,* Special Assistant Attorneys General, for Commonwealth.

*Holbrook M. Bunting, Jr.,* and *Paul Maloney,* for alleged heirs at law.

LEFEVER, J., August 7, 1963.—The jury returned a verdict that testatrix was of sound mind, but subject to undue influence when she executed her disputed will, dated May 16, 1961. Judge Shoyer, the chancellor,

entered a decree approving the jury's verdict and setting aside the will. The exceptions before us challenge the jury's verdict and the chancellor's decree.

Elsie W. Dettra was born September 1, 1875. She died at age 85 on May 19, 1961, leaving an estate which was inventoried at $127,650.86. Three days before her death, in Temple Hospital, she executed by mark the questioned will, which gave her entire estate to ". . . my friends Meyer M. Weissman and Estelle Weissman, husband and wife, in consideration of their having taken care of me for many years . . ." and appointed Weissman executor. The Weissmans were not related to decedent. Weissman's sole connection with her was as manager and part owner of the Washington Hotel since 1937.

Decedent was a spinster. She was short, slight and frail. From 1932 to April 15, 1961, she lived in the Washington Hotel, at Seventh and Dauphin Streets, Philadelphia. This hotel was occupied mostly by older persons, living on pensions, social security, old age assistance, or other meager income. Testatrix lived frugally, even penuriously. For a long time she paid a flat monthly rate of $59 for her room and three daily meals at the hotel. Some years ago, to save costs, she reduced the number of regular meals to two. Finally, she arranged to pay $30 per month for her room; and, in addition, to pay for such meals as she chose to eat there.

Decedent was well educated. She had been a teacher in sewing and dressmaking. She was astute in managing her investments. However, George E. Eichole, her investment broker, testified that she had stopped market transactions about 1956 because of "health and old age." The only mail she received was of a financial nature.

She wore clothing which was Victorian, old, mended, but neat and clean. She wore long skirts, blouses to

match, high-topped shoes, black cotton stockings and long gloves with holes in them. She used five-and-ten cent store spectacles because, in her words, she "couldn't afford to go to an oculist or have glasses made".

During the last five or ten years of her life she kept very much to herself. She sought no visitors or social contacts. She did not go away on visits. Neither relatives nor outside friends ever visited her at the hotel. She indicated to various people that she had no relatives. She was almost a recluse. In many ways she was a miser. In her tiny hotel room she had hoarded a thousand cakes of hotel soap; two or three hundred towels; and many bundles of newspapers.

She crocheted, read newspapers and took walks. She rarely used the hotel elevator, preferring to walk up and down the stairs. She was polite. She was a "sweet old lady." She was very submissive. She was "a very timid, very shy, very, very shy person. . . ." She greeted Mr. and Mrs. Weissman, employes, fellow guests in the hotel, and patients in the hospital with "Good-morning, how are you?" She answered questions with a nod of her head or with a "Yes" or "No." This was usually the limit of her conversations. On rare occasions she permitted other hotel guests to visit in her room, or to hold a brief conversation with her from the hallway as they passed her room.

Decedent had no real friends and few acquaintances. Only four mourners attended her funeral, viz., Mr. and Mrs. Weissman, I. Irving Tubis, Esq., and a woman whom she had casually met in a supermarket.

Her terminal illness, and the events which occurred during it, are crucial to the issues before us.

On April 15, 1961, while on one of her accustomed walks, decedent's right leg, which for some time had shown weakness, "gave way." She fell, breaking her right hip. A police ambulance took her to Temple Hos-

pital. In addition to the fractured hip, she was suffering from malnutrition, dehydration, marked atherosclerosis and hardening of the arteries. The hospital admission questionnaire shows that her answer to the question: "Name of nearest relative or friend" was "None." Several weeks later this was crossed out and Weissman's name was inserted by a nurse because Weissman had told her that he was a friend of decedent.

Mrs. Goldstein, social worker at the hospital, interviewed decedent on April 18 and 21. Her report shows that "she does not have any close friends or relatives. The patient indicated that she had been willed a sum of money at one time and now wanted to use this money for permanent nursing home care."

The surgeons pinned her hip on April 16. A blood clot and gangrene developed in her right leg. Her leg was amputated on April 26. Laboratory examination after the surgery revealed marked atherosclerosis of the blood vessels of the amputated leg. Thereafter, she developed infection at both sites of surgery and also in the bladder and urinary tract. She ran a "spiking" or "zig-zagging" temperature until her death. On May 14, she developed a severe rash over her entire body. The dermatologist diagnosed the extensive medication as the cause. Medication was stopped. The hospital chart records that, at 1:05 p.m., on May 17 she could not be aroused and was placed on the critical list; and at 5:18 a.m., on May 18, she became comatose following a cerebral accident. She died on May 19 at 9:00 a.m. The death certificate shows the cause of death to be "thrombosis of right middle and superior mesenteric artery—severe generalized arteriosclerosis."

She was either bedridden or confined to a wheelchair during her entire hospitalization. She was helpless and completely dependent on nurses for all care. She had to be lifted to and from the wheelchair.

In due course Weissman missed decedent. As a result of telephone calls to police and hospitals he located her at Temple Hospital on April 27, 12 days after her accident. He visited decedent on April 28. He testified that, although during the many years decedent lived in his hotel he had treated her the same as every other guest, on this first visit, two days after her leg amputation, decedent told him she wanted to will her entire estate to him and Mrs. Weissman.

Weissman requested Lester Eisenstadt, Esq., a Deputy Attorney General, to write decedent's will and prepare a power of attorney to enable him to pay her bills and otherwise handle her affairs. Eisenstadt went with Weissman to see decedent on April 30. Eisenstadt testified that she told him to draw a will giving everything to Weissman. However, he first devoted his attention to drafting a broad power of attorney to Weissman. Decedent's execution of this power of attorney was interrupted by a nurse who informed Eisenstadt that it was necessary for him to obtain approval of his visit from the administrative offices of the hospital. He was unable to find the proper administrative officer and left the hospital with the power unexecuted. Weissman later had decedent sign the power. Eisenstadt told Weissman that he had to be in Harrisburg all of the following week on professional commitments. He suggested that many other lawyers were available who could draw wills. He had no further contact with decedent.

On May 5, Weissman retained Philip Klein, Esq., for the purpose of drawing the will. Weissman indicated that decedent wished him to be the beneficiary. He took Klein to the hospital and introduced him to decedent. Klein requested Weissman to leave the room while he talked to decedent alone. He inquired as to her relatives, her assets and the disposition she wished to make of her property. He was unable to obtain any

idea of the amount of her assets, except that she had two bank accounts and two safe deposit boxes. She was very vague as to the location of them. She told him that she had no relatives. He inquired if she wished to leave anything to Weissman. She nodded her head in the affirmative. He inquired, "How much?" No reply. He inquired, "Do you wish to give Weissman $5,000, $4,-000, $3,000, $2,000, $1,000?" No reply. He repeated the question in the same form and, finally, when he reached "$1,000?" she nodded affirmatively and said "Yes." He inquired, "Is that all you wish to give him?" She replied, "Yes." When Klein told Weissman of this, he was disappointed.

Klein was disturbed by the lack of responses from this obviously seriously ill woman, who appeared to have no idea of the extent of her assets. To that end he requested a limited power of attorney, giving access to her safe deposit box at Germantown Saving Fund Society, so that he could ascertain what assets she had. He was also troubled by the fact that Weissman, who had brought him into the case, had indicated that decedent wished to give her entire estate to him and his wife; and, in contrast, decedent had expressly limited his gift to $1,000. In this exigency he called upon the president judge of this court. President Judge Klein advised him to take one of the official examiners of the court with him to examine the contents of the safe deposit boxes and the room of decedent so as to have present an impartial observer who was experienced in examining assets.

Klein requested Harold R. Tawresey, official examiner of this court, to accompany him. They carefully examined the contents of her room, but found little of value. On May 11, Klein, Tawresey and Weissman went to decedent's safe deposit box at the Germantown Saving Fund Society, pursuant to the power of attorney prepared and signed in the presence of the

three of them. In this box they found $31,530 cash in bills of $100 or less. The cash was carefully counted and a complete written inventory of the box was made. As they were leaving the bank, Weissman said to Klein "Why don't we split the $30,000 three ways?"

Following this examination, Klein obtained from Girard Trust Corn Exchange Bank its regular form of power of attorney to enter decedent's box there. Before he had an opportunity to obtain decedent's signature thereto, Weissman visited decedent in the hospital and procured a power from her to enter this box. His excuse was that she wanted him to obtain and bring to her immediately her old will which gave her estate to the Baptist Home. He did not explain why decedent wanted her old will when she was about to execute a new one.

On May 12 and 15, Weissman entered the box at Girard Trust Corn Exchange Bank *alone*. He testified that he made a request of the bank guard that the guard or an officer of the bank accompany him as he opened the box, but was informed that this was contrary to the bank's policy. Weissman testified that all he found in the box was the cemetery deed and stocks registered in the name of decedent. The will was not there. He did not look at the stock certificates or make an inventory of the box. Weissman did not inform decedent until the next day that the will was not in the box (the critical information about which he claimed she was so anxious), even though he drove within four or five blocks of the hospital on his return from the bank to the hotel.

On May 15, Weissman telephoned Klein. He told Klein that decedent wanted to leave all of her estate to him and that he was "to distribute it to those charities he saw fit." He then notified Klein that he had visited decedent's safe deposit box at Girard Trust Corn Exchange Bank alone and found nothing but the cemetery

deed and stock certificates. Klein expressed his disapproval of this conduct. He then stated that, although he had prepared a draft of will for submission to decedent, in view of Weissman's actions and his suggested amazing change in the will, he would have nothing further to do with the case.

Immediately thereafter Weissman retained I. Irving Tubis, Esq., to write the will. At noon, he took Tubis to the hospital and introduced him to decedent. Weissman was present during all, or at least the main portion, of the interview which Tubis had with decedent. Tubis testified that before he met decedent Weissman had told him that decedent wanted to give everything to himself and his wife outright and to name Weissman as executor. During his interview with decedent, *Tubis did not inquire as to the extent of decedent's estate*. He testified that he did not consider this essential.

*After* the interview, Weissman advised Tubis that Klein and Tawresey had been in the picture. In light of this information, Tubis telephoned Klein and Tawresey and invited each of them to serve as co-counsel in the preparation of the will, in witnessing the will and, upon decedent's death, in the administration of the estate. Both of them refused. Upon hearing Tubis' statement that decedent had specified that her entire estate was to go to the Weissmans, both informed Tubis of their opinion that decedent did not have testamentary capacity. Klein aptly testified that his reason for refusing to serve as counsel or co-counsel was that in view of Weissman's entry into the Girard Trust Corn Exchange Bank safe deposit box alone and the alleged change in her testamentary intention, the case had a "bad odor."

Tubis prepared a one-page will, giving everything, absolutely, to the Weissmans and naming Weissman executor. Armed with this will, he met Weissman at the hospital at 9:00 a.m., May 16. Weissman was ac-

companied by Benjamin W. Schwartz, Judge of the Philadelphia County Court. He was Weissman's friend and had been a fellow Republican committeeman. A relative by marriage of his sister was Weissman's partner. It was Weissman's idea, not Tubis', to obtain a judge as a witness.

Lois Diffenderfer, supervisor of the orthopedic ward, lifted decedent into a wheelchair and wheeled her into an adjoining empty room. Although Weissman claimed that he was not present at the actual execution of the will, it is undisputed that all four persons were in this room while Tubis read and explained the will to decedent. Moreover, there was some evidence that he was present at the execution. Tubis asked decedent to test sign her name on a blank envelope. According to him, her signature was a hopeless scrawl, so he decided to have her execute the will by mark. (The envelope and scrawl were not produced at the trial.) Thereupon, Tubis signed her name and then the words "her mark," and she placed an "X" between "her" and "mark." Judge Schwartz and Miss Diffenderfer then signed as witnesses.

Judge Schwartz testified that he asked decedent if she knew what she was doing and she said: "I certainly do know what I am doing . . . they are the only ones that were good to me and I want them to have everything that I own when I die." He did not discuss the size of her estate with her, or ask her about relatives and friends. He did not know that decedent had an amputation. None of the persons present, with the exception of Weissman, had any idea of decedent's sizeable estate. Judge Schwartz testified that this is the only will he has witnessed since he has become a judge. When asked to be a witness by Weissman, he did not realize that testatrix was in the hospital. Tubis did

not bill decedent for drawing the will; he was not paid therefor.

Was this a valid will?

## 1. *Testamentary Capacity*

During most of her stay in the hospital, particularly after May 8, decedent did not read. She had no radio or television. She spoke in monosyllables. She never volunteered words of her own. She greeted other patients with a nod or "good-morning." She responded to persons inquiring "How are you?" by "Fine." She was submissive. She never complained. She made no requests. She did what she was told to do. She was usually drowsy and had to be roused by physicians and nurses. In short, she was a critically ill, quiet, old lady. Despite her sizeable estate and her need of constant attention, she remained in the ward until death.

From April 15, when she entered the hospital, until May 16, the date she executed the disputed will, decedent had undergone the following suffering and tribulation: surgery for her broken hip; gangrene of right leg; amputation of her right leg above the knee; painful bed sores; protracted spiking fever; staphylococcus aureus infection in the hip wound; reopening and drainage of that incision; infection in the stump; bladder infection; vomiting and poor elimination. The following had been administered: anesthesia (twice); enemas; intravenous feeding; blood transfusions; insertion of catheter; and various antibiotics, narcotics and other medications. She became a comatose a day or so after executing the will. She died on May 19.

Dr. G. Harlan Wells, former professor of medicine at Hahnemann Medical College, and specialist in cardio-vascular diseases, summarized decedent's grave condition as reflected in the hospital records, as follows:

". . . she was a very elderly woman. She had been through a great many illnesses. She had fallen and injured her hip which later resulted in an amputation of the leg. She had very obvious cardio-vascular disease, that is disease of the heart, and marked hardening of the arteries. She had a persistent fever which ran a large proportion of the time that she was in the hospital and in fact on the days prior to the 16th of May and on the 16th of May itself and the following days she had fever. The autopsy, the post mortem examination, showed hardening, very widespread hardening, of the arteries of the brain. There was a clot in one of the arteries of the brain which produced paralysis, and her whole physical condition was exceedingly bad, especially the brain, heart, the hardening of the vessels of the leg which resulted in having to have the amputation done, there evidently was infection, because there was fever which continued more or less constantly from the time she was admitted until the date she died."

Dr. Wells did not attend decedent. His testimony was based on the hospital record. He testified that it was not possible to form an opinion on the basis of the hospital record, alone, that decedent had testamentary capacity at the time she executed the will. However, in his opinion, "the record would cast considerable doubt upon her ability to make a will." He testified further that the hospital record showed no injury to her right arm and that her inability to write her name "indicated severe physical deterioration, when taken in connection with autopsy reports on the brain, indicated that her brain was not functioning normally"; "it involves mental capacity to write the name." This is the converse of Keen's Estate, 299 Pa. 430, 434, where the court in sustaining a will stated:

"She signed it in a firm hand, identical with her normal handwriting. The signature being normal tends

to disprove the contention of mental and physical weakness."

Dr. C. P. Kraatz (Ph.D. in Pharmacology) and Dr. Salem H. Lumish (specialist in Internal Medicine), called by the proponents, did not attend decedent. Their opinions were based solely upon the hospital records. Dr. Lumish was of the opinion that decedent was capable of exercising normal judgment at the time she executed her will. Dr. Kraatz testified that she was free from the influence of narcotics or other drugs at this time. On cross examination, the doctors conceded that decedent was in "a very weakened condition," and that the autopsy showed severe atherosclerosis of all cerebral vessels.

The two doctors and proponents relied upon: (1) the fact that decedent was not under the influence of drugs when the will was executed, the medication having been stopped on May 14, because of the rash; (2) the May 2 entry on the chart by Dr. Charles McElree, the attending physician: "This patient knows who she is, knows the name of the President of the United States; generally aware of her surroundings. I feel she is mentally competent"; and (3) the nurse's notation on May 17: "generalized rash very severe today, but patient seems alert and in good spirits as is usual." It is noteworthy that the attending doctor testified that decedent, in answer to his question as to who was president, stated that it was Eisenhower, which he thought was correct. As counsel pointed out, Kennedy was in fact president. The nurse testified that she used the expressions "alert" and "in good spirits" in the comparative sense rather than the absolute sense, because decedent was a gravely ill woman at the time. She testified that decedent never complained, was always taciturn and barely responded to questions, and her note on the chart should be interpreted in the context of such a gravely ill woman who

became comatose the next day and died the following morning.

In contrast to the foregoing testimony of physicians who did not see decedent, Dr. McElree, the resident physician in charge of decedent, testified that, although decedent seemed to be making favorable progress for a few days following the amputation, from about May 8 or 9, she was in grave and constantly deteriorating condition. This was obvious from the constantly "spiking temperature," i.e., normal at one time of day with unpredictable but continuous rises and drops, which is the certain sign of infection, particularly in an aged patient who has undergone major surgery. "Temperature makes aged people lethargic. Decedent's mental capacity was very limited on her admission. Much more limited after May 9." In his opinion, she did not have "the mental capacity to make serious decisions" after May 9. He gave reasons. On May 14, she developed a severe rash over most of her body, which required cessation of medication. Nonetheless, she was usually asleep or so lethargic when he visited her in the ward that she had to be aroused for him to question her and her responses were either negative or monosyllabic. "Once the infection set in, this woman was a very ill person—more or less vegetating." On May 15, he noted "patient is deteriorating." On May 17, at 1:05 p.m., 28 hours after the execution of the will, his notes on the hospital chart read: "Patient seen today and cannot be aroused. Has apparently facial palsy — left radial paralysis."

Dr. McElree testified that atherosclerosis could affect her mental processes. He described this condition: "The patients go in a gradual downhill fashion until death . . . an older patient in her eighties, as this woman, with infection and after a bout with gangrene, it is very difficult for a patient, . . . to live." He testified that her condition was aggravated by the acute rash

which developed on May 14. The doctors were faced with the distasteful choice of continuing the antibiotics which produced the rash and would probably kill her, or discontinuing the medication, thereby leaving the infection free to run rampant, with the likelihood of resultant death. On advice of the dermatologist, they chose the latter of the unpleasant alternatives.

Dr. Joseph Quill, a surgeon, testified that when he told decedent he would have to remove her leg, her only reply was "All right." The nurse corroborated this. In the opinion of the surgeon and nurse, this was not the normal response of a rational person. Dr. Quill testified that "there was no satisfactory conversation possible. I was never sure that she recognized me as the same individual that had been in the day before and said 'Good morning.' She was obviously a woman of little mental capacity." "Well, this was, as I say, a little, apparently frail, old lady who was sleeping most of the time, or apparently sleeping when I visited her. I talked to her about the broken leg, and there was no objection or question, or 'How long will it take?' 'When will I get better?' 'What does this mean?' None of the usual questions you would expect from a healthy individual. Then each day when we visited her, we would ask her how she felt, and she would say 'Pretty good,' in a high pitched voice, and would amplify very little. This was the extent of our verbal communication with her, and we felt that she was not perfectly in touch with her environment, for this reason."

The two supervising nurses, Lois Diffenderfer, and Nancy Petit, testified as to the gravity of decedent's illness. Miss Diffenderfer, testifying as a subscribing witness, expressed the opinion that testatrix was of sound mind when she executed the will. However, on cross examination both nurses indicated doubt as to decedent's comprehension of the necessary ingredients to constitute testamentary capacity.

Miss Diffenderfer stated that there was nothing wrong with decedent's eyes. She could give no clinical reason, involving decedent's eyes, which required the will to be read to her rather than that she read it herself. This raises the inference that the reason decedent did not read the will herself, or place her signature upon it, was because she was so weak, either mentally or physically.

Miss Petit testified that decedent "never offered any conversation to anyone. She never showed any emotion to my knowledge such as she never cried, she never became excited, she never became depressed . . ." She uttered no complaint. She manifested no emotion as to the prospective amputation of her leg. Decedent knew Weissman only as "Mr. Weissman"; she didn't even know his first name.

The autopsy report, which was made part of the record, is revealing. It states, inter alia: "On 5-17-61, the patient was noted to be quite drowsy and at 1:05 p.m., was unable to be aroused. At this time she was noted to have a left hemiparesis and a Babinsky on the left side which was thought to be related to a cerebrovascular accident, probably a thrombosis . . . The patient was placed on the critical list and tube feedings were initiated. On 5-19-61 . . . she expired." The report then discloses marked and severe atherosclerosis of the coronary and cerebral arteries.

It is well settled that an opinion as to testamentary capacity, expressed by a medical witness who has not seen nor examined testatrix, is entitled to little weight; on the other hand, the opinion of a medical witness who has seen and treated decedent at or about the time of the execution of the disputed will is entitled to great weight: Masciantonio Will, 392 Pa. 362, 384; Girsh Trust, 410 Pa. 455, 476. It follows, therefore, that the testimony of Drs. Wells, Kraatz and Lumish is not en-

titled to much weight. Per contra, the testimony of Dr. McElree, the attending physician, is vital. He is the only physician-witness who was in attendance upon decedent on the day the will was executed. Of almost equal importance is the testimony of Dr. Quill, the surgeon who amputated decedent's leg, and supervising nurses Diffenderfer and Petit. However, the opinion of these nurses obviously cannot be equated with the opinions of the physicians. Of great importance also is the autopsy report which impartially reflects the symptoms of decedent which led to her death. The autopsy was made only three days after execution of the will.

We turn now to the nonmedical witnesses with respect to testatrix' testamentary capacity when she executed the disputed will.

Both Klein, an experienced lawyer, and Tawresey, an experienced lawyer, long-time law clerk of this court and presently one of its official examiners, had doubts as to decedent's testamentary capacity after the first interviews. Klein testified that decedent "was so weak that her responses to any questions we put to her were vague, that we had to repeat our questions perhaps two, three or four times in order to get any response." She was very vague and uncertain as to her bank accounts, safe deposit boxes, and other assets. Hence, when Klein and Tawresey learned that during the three days between Klein's last interview with her and Tubis' first interview, she had changed her mind so as to give Weissman and his wife her entire estate, instead of the $1,000 she told Klein she wanted Weissman to have, they reached the conclusion that she did not have testamentary capacity. In Tawresey's words: "the reason I was sure, she was so positive she didn't want him to have more than $1,000 . . . such a change in two or three days showed a change in testamentary capacity or undue influence."

When Klein and Tawresey withdrew from this case, they knew that decedent owned property in excess of $60,000. Under the Philadelphia Bar Association's Minimum Fee Schedule, the minimum fee for serving as counsel in an estate of $60,000 is $2,500. The fact that Klein refused to serve as counsel and that both Klein and Tawresey refused to serve as co-counsel, with such a fee in prospect, adds credence to their testimony. By the same token, the large fee involved on the actual estate bears upon the credibility of the testimony of Tubis.

Tubis baldly testified that this gravely ill woman had testamentary capacity: "she was alert, she was completely cognizant of everything and I had no doubt . . . of any form of diminished competency." However, Tubis readily admitted that he did not question decedent with respect to her assets and that he did not know the size of her estate until after she died. Moreover, he included "intelligent knowledge . . . of the property he possesses" as one of the essential requisites of testamentary capacity, which he enumerated on the witness stand.

This is one of the three cardinal elements which from time immemorial have been deemed essential to testamentary capacity: Glesenkamp Will, 378 Pa. 635. In that case, the court stated at page 639:

" '. . . A decedent possesses testamentary capacity only if he has a full and intelligent knowledge of the act in which he is engaged *and of the property he possesses*, together with an intelligent perception and understanding of the disposition he wishes to make of his property and of the persons and objects he desires to participate in his bounty: Ash Will, 351 Pa. 317, 322, 41 A. 2d 620, 622; Dugacki Will, 356 Pa. 143, 148, 149, 51 A. 2d 627, 630; Patti's Estate, 133 Pa. Superior Ct. 81, 90, 91, 1 A. 2d 791, 796.' " (Italics supplied.)

The record is barren of any evidence that decedent was aware of the nature and extent of her estate. Per contra, the record clearly reveals an aged woman, who for some time prior to her death behaved as an impecunious woman, barely able to survive on a meager income. Decedent told William O. Napoliello, Esq., who prepared her income tax returns, and others that she had no principal assets; only income from an estate. Several guests of the hotel, called as witnesses by proponents, stated that they felt sorry for this poor, sweet, old lady. From time to time they gave her an apple or an orange out of pity for her need. Decedent told Mrs. Weissman she didn't have sufficient funds to leave the hotel for a brief vacation. When the suggestion of a nursing home was discussed with her at the hospital, decedent was vitally concerned about the cost and indicated that "she had about as high as that," viz., $3,000, which the social worker, Mrs. Goldstein, indicated was the minimum amount required for admission to such a home. Decedent remained in the hospital ward of 20 patients while desperately ill and in need of constant care. Klein and Tawresey testified they could not elicit from decedent an intelligent statement of her assets. Nothing which decedent told Klein, Tawresey, Weissman, Eisenstadt, Tubis, the doctors or the nurses, evidences the slightest realization on decedent's part that she owned property having a value of $127,650.

The size of decedent's estate becomes most significant in light of the other facts in this case. If decedent had included in her will $1,000 to Weissman and made him executor, as Klein and Tawresey testified were her wishes, our conscience would not have been shocked. So also, if she had made a similar gift to one of the nurses. Such a gift would be a normal expression of appreciation for special attention. But it is a very different matter when the will gives the Weissmans

$127,650. Therefore, the size of decedents' estate and decedent's lack of knowledge about it attains key importance in this case. Klein fully understood the significance of it. Hence, his visit to her room and to the safe deposit box. He felt that he could not advise decedent properly or write an appropriate, valid will without this basic information. Tubis didn't know, or didn't care about it.

The size of testatrix' estate is the important difference between the instant case and Duncan's Contested Will, 147 Pa. Superior Ct. 133, upon which proponents rely. There, only $14,000 was involved. Hence, that case is not in point here.

Was this a natural will?

Granted that testatrix thought that she had no relatives, or if she had any relatives they had paid no attention to her for many years, it is most unusual to will $127,650 to a hotel manager and his wife who, according to Weissman's own testimony, treated her the same as his other guests during the many years she lived in the hotel. It is more unusual to make such a bequest to a man who had frequently importuned her to make such a will, causing her great distress. Most significant, for years she had a will, dated August 12, 1930, which gave her entire net estate to The Baptist Home, Roosevelt Boulevard and Pennypack Circle, Philadelphia. Donald H. Williams, former trust officer of the National Bank of Germantown, testified that for more than 20 years he had periodically reviewed with her this will and she had regularly told him that she desired to make no change in it. Napoliello testified that she was satisfied with her will and wished to make no change therein. This will, which decedent repeatedly stated had reposed for many years in her safe deposit box in the Girard Trust Corn Exchange Bank, inexplicably disappeared. Moreover,

her instructions to Klein were to give the bulk of her estate to charity. The will in dispute completely departs from this design. It follows that it is an unnatural will.

In Masciantonio Will, 392 Pa. 362, 378 and 379, the Supreme Court, speaking per Mr. Justice Benjamin R. Jones, set forth the rules for determining testamentary capacity:

"Upon the court below rested the duty of balancing and weighing the evidence presented on both sides. Under such circumstances certain basic principles necessarily must guide a court: (1) the burden is upon the contestant to overcome the presumption of testamentary capacity; (2) to sustain this burden the evidence has to be strong, clear and compelling; (3) the testimony of the scrivener, the subscribing witnesses and the attending physicians is entitled to great weight; (4) it is the testator's testamentary capacity at the time the will was executed which controls; (5) the credibility of the witnesses must be determined on the basis of various factors including, in large measure, their interest or lack of interest in the outcome of the litigation."

The court stated further that the testimony of the subscribing witness was entitled to great weight, but was not absolutely controlling.

Section 745 (c) of the Orphans' Court Act of August 10, 1951, P. L. 1163, as amended July 14, 1961, P. L. 610, provides that in a will contest, ". . . the court, in its discretion at any stage of the proceedings, may impanel a jury to decide any question of fact but the *verdict of the jury shall be advisory only*." (Italics supplied.) Therefore, in passing upon the jury's advisory verdict in this case the chancellor and the court en banc are governed by the rules for weighing evidence set forth in Masciantonio Will.

After reading the entire record in this case, in the light of Masciantonio Will, we are all satisfied that

the testatrix did not have testamentary capacity at the time she executed the disputed will. The key element, knowledge of the extent of her estate, is missing. The evidence is overwhelming that decedent did not know the extent of her estate. The absence of this critical essential, alone, is sufficient to tip the scales. Moreover, the credible evidence is clear that this desperately ill old lady, when she executed this will, only 28 hours before she could not be aroused and was placed on the critical list, was so weak in mind and body that she could not have had testamentary capacity.

We agree, therefore, with the statement of the learned chancellor in his decree, "If the chancellor had heard this case without a jury, on all the evidence he would have found that decedent was *not* a 'person of sound mind'." Accordingly, pursuant to the authority vested in us by section 745 (c) of the Orphans' Court Act of 1951, as amended in 1961, and with the express approval of the chancellor, we rule that at the time decedent executed the disputed will she did not have testamentary capacity, and we reject the jury's verdict on this point.

## 2. *Undue Influence*

The Weissmans are "strangers to the blood" of decedent. The sole relationship between decedent and the alleged beneficiary was a business one. Weissman reiterated on the witness stand that he had treated decedent the same as every other guest and gave her no special favors. When pressed on cross examination as to why she should have willed him and his wife her large estate, he stated it was because of his kindnesses to her, i.e., his advice, when she appeared financially pressed, that she could reduce her commitment at the hotel to two meals per day or to optional meals, and a later suggestion that she could move into a smaller room.

The record indicates a continuous pattern over the years of Weissman importuning and persuading guests of his hotel to make wills in his favor. For example, 84-year-old Julia Dauscher has executed a will, which is still in existence, giving everything to Weissman. Frank Graeff, another guest, willed one-third of his estate to Weissman five months before he was adjudicated mentally incompetent by this court. Tubis drew this will. Tubis testified that he thought Graeff had testamentary capacity when he executed the will. Yet on Tubis' advice, Weissman did not attempt to probate it.

Napoliello testified that on several occasions Weissman attempted to persuade him to draw wills for aged persons, naming Weissman a beneficiary, without Napoliello meeting the testators. He also testified that over the years, while he was preparing decedent's income tax returns, decedent frequently complained to him that Weissman had been exerting pressure upon her to write a will in his favor. He testified that decedent was most resentful and fearful of Weissman; that she indicated both dislike and distrust of him; that she was very unhappy with Weissman's changed operation of the hotel from the previously "nice, quiet hotel with a lot of elderly people" to "a bawdy house", with loose men and women abounding; and that she asked his advice as to how to protect herself from Weissman's importunities. This was corroborated by James N. Pierce, a former guest of the hotel, who stated that in 1956, decedent, sobbing and crying, told him "that pest [Weissman] is trying to get my money." She repeated this statement to Pierce on other occasions, saying Weissman was trying to entice her to go to his lawyer to make a will in his favor. She then told Pierce that she "wanted her money to go to the Baptist Home."

In view of these numerous, repeated statements made by decedent to him over the course of years, Napoliello was so astounded when he read of decedent's death and the probate of a will which gave everything to the Weissmans that he called upon Judge Bolger of this court for advice as to what it was his duty to do under the circumstances. In view of Napoliello's impression that decedent had no relatives, Judge Bolger properly advised him to communicate with the attorney for the Commonwealth so that the latter could investigate and, if he deemed it advisable, take appropriate action. The Commonwealth later filed the pending appeal.

Parenthetically, this is the only occasion in the judicial experience of the members of this court in which two lawyers, separately and independently, consulted two judges of this court for advice because of suspicious, unusual conduct on the part of a person apparently bent on obtaining the estate of an elderly, sick, friendless testatrix. And witness Pierce testified that he was so shocked with the press report of decedent's will that he voluntarily contacted the authorities and reported to them the fears which decedent had repeatedly expressed to him concerning Weissman.

In the course of 18 days of decedent's terminal illness, viz., from April 28 to May 16, Weissman (1) retained three successive lawyers to obtain from decedent powers of attorney authorizing him to manage her assets and to write a will giving her estate to him and his wife (Weissman admitted on cross examination that decedent didn't tell him what lawyer to get and he made the choice) ; (2) introduced each of these attorneys to decedent and, except when Klein excluded him, was present at these conferences which were of primary interest to him; (3) was displeased when Eisenstadt and Klein turned their attention first to preparing powers of attorney rather than the drafting of the will he requested of them; (4) exhibited dis-

appointment when Klein informed him that he was to receive only $1,000 under the will he was drafting; (5) offered to divide the $31,530 cash in decedent's Germantown Saving Fund Society safe deposit box with Klein and Tawresey; (6) when Klein refused this offer, Weissman induced decedent to give him a power of attorney which permitted Weissman alone to enter the Girard Trust Corn Exchange Bank safe deposit box; (7) entered this box alone on two occasions and stoutly swears that the box contained only registered stocks and a cemetery deed; (8) cashed dividend checks found in decedent's room, turned the cash over to Tubis and did not report this cash to the decedent or report it as a part of decedent's estate for accounting or inheritance tax purposes; (9) did not disclose to Klein that he had previously retained Eisenstadt to write decedent's will and to obtain for him a broad general power of attorney; (10) introduced Tubis to decedent without informing Tubis that, through Weissman's arrangement, Eisenstadt, Klein and Tawresey had theretofore visited decedent professionally; (11) arranged to obtain a judge of the county court as a witness to give an aura of propriety to the execution of this highly questionable will; (12) was present during the reading and explaining of this will and, according to some of the evidence, was present at its execution. Significantly, after the will was executed, Tubis gave it to Weissman for safe keeping. Weissman had a power of attorney over decedent's bank accounts; power to pay her bills; power to provide her with the necessities of life. Decedent was in his control and power. He was present at all key times. In short, in every basic way he was in position to exert his influence over this desperately ill, submissive, friendless, old lady, who was weakened in mind and body.

To constitute undue influence, it is necessary that the mind of testatrix be dominated and almost im-

prisoned by the guilty party. It can be accomplished by fraud, threats, misrepresentation, inordinate flattery, or moral or physical coercion: Ash Will, 351 Pa. 317. The evidence is clear that Weissman had attempted to exert his influence over decedent for many years and, although she long resisted his advances while she was in good health, she finally succumbed in her terminal illness. The extent of his domination over decedent is illustrated by the fact that decedent, born of Quaker parents, a longtime member of a Baptist Church in Germantown, who in her earlier will had given her entire estate to the Baptist Home and who first told Anna Lee Goldstein, the social worker, that she wished to enter a Quaker or Baptist nursing home, agreed to enter a Jewish home after Weissman took over her affairs and told her to do this. Weissman admitted that the Lucian Moss, Willow Crest and Tel Aviv homes agreed to take her as a guest only if she was satisfied to eat Kosher meals. Decedent agreed. Is this the natural, rational reaction of this Quaker-born, later Baptist, always-Protestant old lady?

Weissman and his wife explained their conduct by repeating that decedent, from Weissman's first visit to her in the hospital on April 28, continuously insisted that she wanted to give the Weissmans everything at her death. This was corroborated by Tubis and, in a measure, by Eisenstadt. A number of guests testified as to fragmentary statements made by decedent to them which indicated her admiration and liking for the Weissmans. But, if she wished to give the Weissmans her estate "in consideration of their having taken care of me for many years," why did she wait until three days before her death, and until Weissman brought the third lawyer to her?

The conduct of Weissman from April 28 to May 16 is strange at best and suspicious, if not venal, at worst.

Significant was Weissman's proposition to Klein, as they left decedent's safe deposit box at the Germantown Savings Fund Society: "Why don't we split the $30,000 three ways?" Klein's reaction was: "I assumed he was jesting and just passed it off as if he were making a joke about it." We don't pass it off as a joke. No one, with any sense of decency, would joke on this subject. Moreover, when Klein did not accept his offer to divide the cash Weissman procured the power from decedent and rushed to the Girard Trust Corn Exchange Bank box *alone*.

Did this box contain cash, negotiable bonds, or decedents prior will? Decedent at one time owned bonds. It is not unlikely that, having $31,530 in cash in one safe deposit box, she had some cash in the other. What happened to her original will? Decedent had told a number of people of its existence. Weissman testified that decedent sent him to the box to get the will for her. We have only the unsupported word of Weissman that the will, bonds and cash were not in the box. What kind of man is this who would procure a power of attorney and enter *alone* this safe deposit box of this aged, ill woman, *immediately following* the careful entry and inventory of the first box, supervised by orphans' court examiner, Tawresey, and while Klein was in the process of preparing a will for decedent which *Weissman knew would give him $1,000 only?* The reasons Weissman gave for this remarkable performance were (1) that decedent was very angry when Weissman told her that the power to enter the Germantown Saving Fund Society box was in the name of Klein alone, despite the fact that it was understood by everyone that the three would go together to the box, that they immediately did so, and that the power was exhausted by this one entry; and (2) that decedent wished him to search for decedent's outstanding will which gave her estate to the Baptist Home, despite the fact she had just in-

structed Klein to draw a new will for her. These excuses are transparently absurd. The jury did not believe them. Neither do we!

By any standard, Weissman's conduct amounted at best to improper persuasion or coercion; at worst, patent fraud. There is no doubt in the minds of any of us that on this record Weissman clearly exercised undue influence upon the decedent. This is so, irrespective of burden of proof.

It is a well established principle of law, however, that where the testatrix is weakened in mind or in body and the beneficiary is in a confidential relationship, the burden of proving lack of undue influence falls upon that beneficiary.

Thus, in Schwartz's Estate, 340 Pa. 170, 173, it was stated:

" 'Where a person has testamentary capacity, but is so weak *physically* or *mentally* as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the latter to show that no improper influence controlled the making of the will': Phillips' Est., 244 Pa. 35, 43, 90 A. 457. See also Buechley's Est., 278 Pa. 227, 122 A. 287, and Miller's Est, 265 Pa. 315 108 A. 616." (Italics supplied.)

In Skrtic Will, 379 Pa. 95, 102-103, the court said:

"It has been held in a long line of cases that even if a person has testamentary capacity, but is so weak *physically* or *mentally* as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the latter to show that no improper influence controlled the making of the will." (Italics supplied.)

And in Hurst Will, 406 Pa. 612, 617, the court, speaking through Mr. Justice Eagen, stated:

"In Quein Will, 361 Pa. 133, 62 A. 2d 909 (1949), this Court at 145, succinctly defined what constitutes undue influence sufficient to void a will, and explained the burden and nature of proof where such is asserted. 'There must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testator, or destroy his free agency, or to operate as a present restraint upon him in making of the will:' Generally, there is a presumption of the absence of undue influence and the burden of proof is upon those who assert it. However, 'where there is evidence of *confidential* relation coupled with a *weakened mind,* the burden of proof shifts to proponents. Such evidence, however, need not be sufficient to establish testamentary incapacity. All the evidence need show is bodily infirmity and weakened mentality. Where the evidence shows bodily infirmity and greatly *weakened mentality,* and a stranger to the blood of testator, standing in a confidential relation, is benefitted by the will which he has been instrumental in having executed, a *presumption* of undue influence arises': pp. 145 and 146. Accord, Kerr v. O'Donovan, 389 Pa. 614, 134 A. 2d 213 (1957)."

In Leedom v. Palmer, 274 Pa. 22, 25, Mr. Justice (later Chief Justice) Kephart stated:

". . . Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; in both an unfair advantage is possible. When these circumstances appear, the law presumes the transaction void, unless

the party claiming the benefit of such transaction shows affirmatively that no deception was used and the act was the intelligent and understood act of the grantor, fair, conscientious and beyond the reach of suspicion. No precise language can define the limits of the relation or fetter the power of the court to control these conditions. While not confined to any specific association of parties, it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In some cases the confidential relation is a conclusion of law, in others it is a question of fact to be established by the evidence."

Let us apply these principles of law to the facts in the present case.

There is no doubt about decedent's abject physical weakness. She was solely dependent upon her nurses for all locomotion. She was so weak that she could not sign her name to the will. There was also ample evidence of mental weakness. The hospital records show that she was suffering from hardening of the arteries, atherosclerosis, debilitation, acute infection, "spiking" or "zigzagging" temperature and general deterioration. The testimony of her attending physician reveals that she was lethargic, drowsy or asleep whenever he called to see her. She was only a few hours from unconsciousness and three days from death when she executed the disputed will.

By his own admission, Weissman was in a confidential relationship with decedent, at least from April 28 until the date of her death. He testified that decedent had great confidence in him and relied upon him. He held three broad powers of attorney from her; he had access to her safe deposit box and to her bank accounts; he applied her assets to the payment of her hospital bills; he retained, unreported, dividends of hers; he took over the responsibility of arranging for her ad-

mission to a Jewish nursing home; he selected three successive lawyers for her (Eisenstadt, Klein and Tubis). Supervisory Nurse Diffenderfer testified that decedent said of her suggested admission to a Jewish nursing home, "Anything Mr. Weissman says is all right with me."

Weissman was the main witness for the proponents. His credibility was an important issue. The jury was entitled to evaluate his strange explanations of his unusual conduct from April 28 to May 16, and his contradictions on the witness stand. They also were privileged to note that he lied under oath on his marriage license application: viz., that he had *never* been married before, when in fact he had been married and divorced.

Finally, the conduct of Tubis deserves attention. At the request of Weissman, he went to the hospital room of a patently gravely ill woman to make a will for her which gave everything to "strangers of the blood," and named Weissman executor. He permitted Weissman to remain in the room while he interrogated decedent as to her wishes and on the next day during the reading and explaining of her will. He did not inquire as to the amount and nature of her assets, the importance of which has heretofore been discussed. After the first visit he learned that Klein had been previously retained, and that Klein and Tawresey had visited decedent. Klein and Tawresey refused to have anything to do with the case despite sizeable attorneys' fees in prospect. They notified Tubis of the testamentary wish which decedent had expressed to them several days before, viz., $1,000 to Weissman. They warned him that in their opinion decedent did not have testamentary capacity. Tubis knew about the Graeff will—he drew it.

What should a lawyer have done in those circumstances? (1) He should have interviewed testatrix *alone*, with Weissman nowhere in sight; (2) he should have ascertained (a) her relatives; (b) the size and nature of her estate; and (c) if he learned that her estate amounted to $127,650, he should have made certain that she wished to give such a large sum to strangers to the blood, rather than to her favorite charity; and (4) he should have consulted the attending physician as to decedent's testamentary capacity. Tubis did none of these.

The language of Freed's Estate, 327 Pa. 572, 577, is apposite:

"While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can—and in a case such as the present must—recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it, and in which appellant, the sole beneficiary, played such a ruthless and dominating part."

We conclude that there was abundant evidence that Weissman exercised undue influence upon decedent in connection with the preparation and execution of the disputed will. He did not meet the burden cast upon him to disprove this. The jury reached a correct verdict. We unhesitatingly sustain the verdict of the jury and the decree of the chancellor as to this.

### 3. *Proponents' Exceptions*

Proponents have filed 62 exceptions. We shall briefly consider several of them.

### (a) *Failure of Trial Judge to Disqualify Himself.*

Philip Klein, Esq., troubled by decedent's apparent lack of testamentary capacity and Weissman's con-

duct, came to Judge Klein of this court for advice as to what was proper for him to do. That Judge Klein was his brother was a coincidence, he came to the president judge of this court on a vexing problem. Judge Klein properly suggested that he request one of our official examiners to accompany him in the investigation of decedent's assets. Pursuant to this advice, Philip Klein arranged with Harold Tawresey, an official examiner and a former law clerk of this court, to accompany him.

This course of procedure was proper. It is a proud tradition of this court that the judges and the law clerks are available to aid counsel in perplexing problems. We sent official examiners out specially in the case of Harry Alker, who was eventually disbarred: In re Alker, Jr., 16 D. & C. 2d 653. This procedure has been followed in other cases where the propriety of the conduct of a member of the bar or the status of his client has been at issue. See Riley Estate, 11 D. & C. 2d 399.

After decedent's death, Napoliello consulted Judge Bolger as to what steps he should take in the light of the wide variance between news reports of the provisions of decedent's will and decedent's statements to him about Weissman. Judge Bolger properly advised him to direct this information to the attention of the attorney for the Commonwealth so that the latter could make such investigation and take such steps as he might see fit.

Based upon the visits of Klein and Napoliello to judges of this court and the fact that Tawresey, an official examiner of this court and former law clerk of Judge Shoyer, would be a witness, exceptants filed a motion that Judge Shoyer disqualify himself and grant a change of venue.

No member of this court has a financial or other interest in this estate. This case was in no sense pre-

judged at the two above mentioned consultations. The relation between Judge Shoyer and his former law clerk did not disqualify him from acting as hearing judge, particularly in view of the fact that Tawresey has no financial interest in the case. If the bar and public cannot seek the aid of the courts in these troublous times, where shall they turn?

Finally, the motion by proponents that Judge Shoyer disqualify himself was not made until the morning of the trial, many weeks after the trial date had been set. The jury had been summoned to Judge Shoyer's courtroom and a horde of witnesses was present, voluntarily or by subpoena. This court does not have juries regularly available. Therefore, far in advance we must specially schedule a date for trial when the common pleas court can supply us with a jury. Moreover, this is the third date specially fixed for this jury trial. Furthermore, as pointed out in our earlier opinion in this case, Dettra Estate, 29 D. & C. 2d 429, one of the physicians, a key witness, was about to complete his residency in Philadelphia and leave for California. Another resident had already departed. If exceptants wished to press this request for disqualification, they should have filed an appropriate petition with the court or hearing judge long before the date for trial.

We rule that the exceptions on this point are without merit in substance and that exceptants, by their delay, have waived their right to press the point.

(b) *The Commonwealth and the Baptist Home Should Have Been Stricken as Parties.*

We have already decided this point: Dettra Estate, 29 D. & C. 2d 429.

It is to be noted that the Baptist Home may well become a very important party in this case. The conduct of Weissman in entering the Girard Trust Corn

Exchange Bank safe deposit box of decedent *alone* is suspect. The testimony of bank officer Williams, Napoliello and Weissman was that decedent had told each of them that her earlier will, giving her entire estate to the Baptist Home, reposed in her safe deposit box at Girard Trust Corn Exchange Bank. There is a very strong inference that the will actually was there; that Weissman took it; and that he either then destroyed it or still has it in his possession. If so, in subsequent proceedings, there may well be an attempt to prove it as a suppressed or lost will. Should the Baptist Home be successful in these proofs it would be entitled to decedent's entire estate.

It follows that the Baptist Home is still a proper party in this case. No error was committed in permitting the Baptist Home and the Commonwealth, as a possible heir, or as parens patriae for the Baptist Home, to remain as parties.

(c) *Impaneling the Jury at the Outset of the Trial.*

Section 745 of the Orphans' Court Act of 1951, as amended in 1961, provides as follows:

"(c) Will Contest . . . When a contest shall arise concerning the validity of a writing alleged to be testamentary . . . the court, in its discretion at any stage of the proceedings, may impanel a jury to decide any question of fact but the verdict of the jury shall be advisory only."

The language of this amendment is plain. A study of the history and language of the prior statutes and the case law on the subject makes this language even more clear. A judge of this court now has undoubted power and right in his "discretion at any stage of the proceedings" to impanel a jury "to decide any question of fact." The trial judge based his decision to impanel the jury on allegations set forth in the pleadings and

facts disclosed at several pretrial conferences. The trial judge properly exercised his discretion in this case. No motion was made at the conclusion of the evidence that a "question of fact" was not involved. Therefore, the trial judge made no error in impaneling a jury at the outset of the trial, nor in giving the issues to them for their verdict.

(d) *Conduct of the Judge at the Trial.*

This will contest lasted two full weeks. On occasion tempers flared. Many of the statements of the trial judge, assigned as error, are taken out of context.

We have carefully reviewed all the assigned errors on this point and are satisfied on the entire record that no material errors were made by the trial judge in his various comments and rulings.

(e) *Polling the Jury.*

It is well established that the privilege of polling a jury in a civil case is discretionary with the trial judge: Reed v. Kinnik, 389 Pa. 143. Hence the refusal of the trial judge to permit it was not reversible error.

In the instant case, exceptants' counsel was not present when the jury returned. There is no duty upon the court to summon trial counsel and to postpone receiving the verdict of the jury until he appears. It is counsel's duty to be present. This is particularly so when it is late in the afternoon and the jury has been sitting for two tedious weeks.

The jury had been *discharged* by the court prior to exceptants' counsel's request that it be polled. The fact that the individuals comprising the jury had not dispersed is irrelevant. The jury, having been discharged, was no longer a jury but a group of 12 citizens. Had these 12 citizens been polled and a question as to the accuracy of the verdict had arisen, the admissibility

of the statements of any of these 12 citizens would have been subject to the fundamental rule of law that the jury cannot impeach its own verdict after it has been discharged. The only result would have been confusion because, having been discharged, the 12 citizens could not have retired for further deliberation: they were no longer a jury.

It follows from the above that the trial judge did not abuse his discretion when he refused exceptants' counsel's request to poll the 12 citizens who had constituted the jury, after the jury had been discharged.

(f) *Other Exceptions.*

We have carefully examined and considered the 62 exceptions, the 1,630 pages of testimony and exhibits, the careful charge of the court and the comprehensive briefs of counsel. We have listened to counsel's able oral arguments. We are all satisfied that the trial was fair; that the charge was proper, fair and impartial; that the trial was free of substantial error; and that proponents' exceptions and motions are without merit. We agree with the jury's verdict as to undue influence and, with the concurrence of the chancellor, we decide that decedent lacked testamentary capacity when, on May 16, 1961, she executed the alleged will.

### 4. *Conclusion*

Accordingly, the proponents' exceptions and motions for judgment n.o.v. and new trial are dismissed; the contestants' motion for judgment n.o.v. and exceptions are, in effect, sustained; the verdict of the jury is accepted as to question 2 and rejected as to question 1; and decree of the chancellor is modified so that the will is hereby set aside on the grounds (a) that decedent lacked testamentary capacity when she executed the disputed will, dated May 16, 1961, and (b) the disputed

will, dated May 16, 1961, was procured by undue influence. Finally, the record is herewith remitted to the register.

### Concurring Opinion

SHOYER, J., August 7, 1963.—As chancellor, I approved the jury's verdict immediately upon its being rendered. Again, in support of my decree of May 20, 1963, I stated that their finding of sound mind on the part of Miss Dettra did not shock my conscience although I myself, if sitting alone, would have found that she lacked testamentary capacity on the date of the alleged will, May 16, 1961. The jury's special verdict had also established that undue influence was exerted by Mr. Weissman to make his wife and self the sole legatees, so this was sufficient ground on which to base my decree invalidating the will.

As a member of our court en banc, after hearing the arguments of counsel and after further consideration of the authorities, I have decided to join in the opinion which Judge Lefever has written for our court and concur in its holding that Miss Dettra lacked testamentary capacity. The "roguish conscience" decried by Selden** is to be deplored just as much when the

---

** This oft-quoted criticism of Lord Selden which is so frequently misapplied, in complete ignorance of the subject or the occasion to equity jurisdiction in general, may be found in full in Pomeroy's Equity Jurisprudence (5th ed.), vol. I p. 74, as follows:

"Equity is a roguish thing. For law we have a measure, and know what we trust to. Equity is according to the conscience of him that is Chancellor; and as that is larger or narrower, so is equity. 'T is all one as if they should make his foot the standard for the measure we call a Chancellor's foot. What an uncertain measure would this be! One Chancellor has a long foot, another a short foot a third an indifferent foot. 'T is the same thing in the Chancellor's conscience."

"Chancellor's foot" is long as when it is short. The dispenser of equity should be guided by established principles, not personal inclinations. When we search for these principles among our cases, what do we find?

Sound reason for modifying the views which I have recorded as chancellor is found both under the cases and the current statute relating to jury trials in the orphans' court. Historically, the jurisdiction in will contests exercised by the orphans' court comes from equity: Fleming's Estate, 265 Pa. 399, 407. Decreeing the invalidity of a will calls for the application of an equitable remedy, viz., rescission. The court is doing for the alleged testator that which he cannot do for himself, to wit, either correcting an error which he would have avoided if of sound mind, or righting a wrong perpetrated against him by some unscrupulous third party: Fleming's Estate, supra, p. 407. In addition, undue influence and forgery are both grounded in fraud, relief against which (especially constructive fraud) could be obtained solely in the equity court many years ago. Fraud was perhaps the earliest ground of equitable jurisdiction: Pomeroy's Equity Jurisprudence (5th ed.), Vol. III, pp. 580-1.

That the judges of our Pennsylvania orphans' courts have inherited these broad equitable powers is clearly demonstrated by many appellate decisions. The judge sitting in a will contest is not only called a chancellor, but possesses all the power and authority of a jurist sitting in a court of equity: Fleming's Estate, supra, p. 406; Williams v. McCarroll, 374 Pa. 281, 293, 297. In equity, the findings of a jury lack the impregnable qualities of a verdict establishing the facts in a court of law. They are advisory only, cannot bind the conscience of the chancellor, and should form the basis of his decree only when they are fully supported by competent evidence and he is satisfied with their justness.

Our Supreme Court early gave expression to this

limitation in the rules which it established for the conduct of equity business by the courts of Common Pleas throughout the Commonwealth. An illustration of the application of these rules is found in New York Life Insurance Company v. Bodek Corporation, 320 Pa. 347, where the chancellor, deeming the findings of the jury on the questions presented to them as binding upon him, unless on the evidence judgment n.o.v. should have been entered, accepted their findings as true, and on that basis dismissed the bill and entered a decree nisi for the beneficiary for the amount of the insurance. Plaintiff filed exceptions to this adjudication, and, after an argument before the court en banc, the latter held (the chancellor concurring in the decision) that the findings of the jury were not binding upon the chancellor, but merely advisory. Our Supreme Court held that this ruling was clearly correct since the equity rules provided that the answers of a jury made to inform the conscience of a chancellor should not be binding upon him. Further, the lower court en banc held that the findings of the jury were opposed to the weight of the evidence, and the fact that the insured had falsely answered the question as to medical examination on the insurance application, was practically admitted by the beneficiary.

In the orphans' court, the practice is the same. "In a will contest the judge sits as a chancellor . . . and must consider all the evidence; and the question is not whether a part of the evidence, standing alone, would support a certain verdict but whether it would considered as a whole": Fleming's Estate, supra, p. 406.

But:

" "In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury—it must as a whole be judged by him independently of the jury —must satisfy his (legal) conscience as well as the

jury—and cannot be rightfully submitted to the jury as a basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he as a chancellor (after weighing the evidence in the light of the established law upon the subject) would not do' ": Phillips' Estate, 244 Pa. 35, 42, 90 Atl. 457, quoting with approval from the opinion of Judge Endlich in Caughey v. Bridenbaugh, 208 Pa. 414, 415, 57 Atl. 821, affirmed per curiam.

"The foregoing quotation was spoken with respect to a jury's verdict on the trial of an issue d.v.n. certified to the Common Pleas under the practice obtaining prior to the Act of July 1, 1937, P. L. 2665, 20 P.S. §2585. It is no less applicable to a jury's verdict in the trial of an issue in the Orphans' Court under the provisions of that Act. The Act of April 22, 1905, P. L. 286, 12 P.S. §681, which provides for the filing of motions for judgment n.o.v., is adaptable to the trial of an issue d.v.n. only to the extent of the procedure it prescribes for raising the alleged invalidity of a verdict as a matter of law. It does not import into the question of the sustainability of a verdict on an issue d.v.n. the binding effect of the rule as to the evidence permissibly cognizable in testing a verdict rendered by a jury in a trial at law": Stewart Will, 354 Pa. 288, 295.

"While a verdict of a jury will not be lightly set aside, the trial judge, sitting as a chancellor . . . still has complete control over the verdict": Lare Will, 352 Pa. 323, 337 (concurring opinion, Mr. Justice Stearne).

The statutory requirements for will contests were last amended by Act of July 14, 1961, P. L. 610, effective September 12, 1961. Although Miss Dettra had died prior thereto, the amended act being procedural in nature, governs the present litigation. The title states its purpose as "clarifying provisions relating

to verdicts". Section 745 of the Orphans' Court Act of 1951, which was amended in 1956, was repealed completely and rewritten. It now provides in (c):

"When a contest shall arise concerning the validity of a writing alleged to be testamentary . . . the court, in its discretion at any stage of the proceedings, may impanel a jury to decide any question of fact but the verdict of the jury shall be advisory only."

The 1961 amendment differs from the 1956 amendment in eliminating all reference to "a substantial dispute of fact." Having been enacted after the decision of our Supreme Court in Murray Will, 404 Pa. 120, it was doubtless intended to broaden the discretion of the lower court, and modify the effect of that decision. The 1956 amendment was intended to reintroduce the rule of Stewart Will, Williams v. McCarroll, and Fleming's Estate, all supra, "and make it clear that the Orphans' Court has control over the verdict": Comment of Joint State Government Commission. This same intention was undoubtedly pursued in the 1961 amendment.

Will the evidence when *considered as a whole* support the jury's finding of testamentary capacity? Demonstrably it will not. The testimony of those present at the execution of the will barely establishes a prima facie case at best. Weissman was, of course, an interested witness, and Tubis, the scrivener, having participated in the contest, cannot be considered disinterested: Masciantonio Will, 392 Pa. 362, 380. The beliefs held by the subscribing witnesses as to Miss Dettra's mental capacity depend on their inferences or deductions from her spoken words, acts and conduct: Girsh Trust, 410 Pa. 455, 467. Judge Schwartz's conversation with her was brief, held mostly in the presence of Weissman, and he did not discover her amputation. She never told them that her estate even approximated $125,000, and it is apparent that both witnesses considered its value to be much less. This impression they

had gathered from her admittedly few words, her acts and her conduct. Following her death, they were surprised to learn the substantial amount of her possessions. Undoubtedly, testatrix' failure to convey some idea of the approximate size of her estate was due to her own inability to comprehend it. Her "general" knowledge, if she had such, was insufficient: Glesenkamp Will, 378 Pa. 635, 640. Her testamentary capacity is dependent upon a *"full and intelligent knowledge"* of both the property she possessed and the natural objects of her bounty: Glesenkamp Will, supra, pp. 639, 640; Morgan's Estate, 146 Pa. Superior Ct. 79, 87.

In the light of my charge, the jury's finding of undue influence carries a strong implication that testratix was suffering from a weakened intellect not only on May 16, 1961, but for some time before. This is corroborated by her inability to sign her name, and by the hospital notation of malnutrition and dehydration made at the time of her admission on April 15. The prolonged and complex hospital history, which is undisputed, convinces all of us that decedent, by May 16, had deteriorated so far that she unquestionably lacked a full and intelligent knowledge of her estate. She was unable to fully understand the meaning of the act in which she was engaged, even as she evidently lacked full appreciation of the significance of her amputation.

Where careful examination of all the evidence in the light of the pertinent authorities clearly establishes testamentary incapacity as in this case, the court should not hesitate to enter judgment notwithstanding the jury's verdict. Accordingly, I concur in the opinion of Judge Lefever written for our court en banc.